In re MORRISTOWN LINCOLN-MER-
CURY, INC., Debtor.

Richard STAIR, Jr., Trustee, Plaintiff,

v.

HAMILTON BANK OF MORRISTOWN,
Defendant.

Bankruptcy No. 3-81-01889.
Adv. No. 3-83-0886.

United States Bankruptcy Court,
E.D. Tennessee.

July 31, 1984.

Richard Stair, Jr., Knoxville, Tenn., pro se.

Frank P. Cantwell, Jr., Morristown, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

Section 542 of the Bankruptcy Code, 11 U.S.C.A. § 542 (1979), generally requires anyone holding property of the estate to deliver such property to the trustee. In this adversary proceeding the plaintiff trustee seeks an order requiring the defendant Hamilton Bank of Morristown (Bank) to turn over all funds on deposit in a dealer reserve account, to wit, $43,343.05, together with interest. The defendant Bank denies the trustee is entitled to a turnover order and asserts, by counterclaim, that it is entitled, pursuant to 11 U.S.C.A. § 553(a) (1979), to set off the funds on deposit in the reserve account against its claims, totaling approximately $43,583.71 plus attorney fees, owing by the debtor. Relief from the automatic stay, 11 U.S.C.A. § 362(a) (Supp.1984), is requested for the purpose of exercising the asserted setoff right. The Bank also asserts that it holds a security interest in the disputed funds, or, alternatively, that the reserve account represents a common law pledge securing any indebtedness of the debtor to the Bank.

### I

The facts have been stipulated. Morristown Lincoln-Mercury, Inc. filed its voluntary chapter 11 petition on December 17, 1981. Four weeks later the debtor's case was converted to a case under chapter 7. 11 U.S.C.A. § 1112 (1979).

The ordinary course of debtor's prepetition business involved the sale and leasing of its inventory of new and used motor vehicles. The Bank provided financing for some of the debtor's customers by purchasing their retail installment sale contracts from the debtor at a discount. All of these installment sale contracts purchased by the Bank were purchased with recourse against the debtor.

A "Repurchase Agreement (Retention Plan)," dated September 19, 1975, between the debtor and the Bank provided for the creation of the reserve account at issue. Under the terms of this agreement, when the Bank purchased chattel paper from the debtor, an amount determined by an equation specified in their agreement was withheld by the Bank and deposited in a noninterest-bearing reserve account established in the debtor's name at the Bank. No funds were deposited in this account other than funds withheld by the Bank from its payment to the debtor for the chattel paper it purchased. The debtor did not have access to funds in the reserve account.[1] All chargeoffs or unearned interest refunds to the debtor's customers or related withdrawals from the account were effected by the Bank. Further, the Bank was not obligated to either segregate funds deposited in the reserve account from general deposits or refrain from using the funds in its general business operations. Monthly statements reflecting the balance in the reserve account were forwarded to the debtor. On the date debtor's bankruptcy petition was filed the balance in the reserve account was $43,343.05.

In addition to purchasing chattel paper from the debtor, the Bank also provided "floor plan" financing for the debtor pursuant to a "Security Agreement on Dealer Inventory, Accounts Receivable, Contract Rights and Proceeds." This agreement, dated July 30, 1981, secures the payment of "all indebtedness and liabilities whatsoever" of the debtor to the Bank, "absolute or contingent, due or to become due, whether now existing or hereafter arising, as principal ... guarantor or otherwise." It grants the Bank a security interest in the debtor's "inventory." As specifically defined in the agreement, "inventory" includes the proceeds from lease or sale of motor vehicles and "[a]ll contract rights of debtor now or

---

1. The Repurchase Agreement did entitle the debtor to payment, on mutually agreed upon dates, of an amount by which the balance in the reserve account exceeded five percent of the aggregate unpaid balance on all contracts purchased by the Bank from the debtor, provided that the debtor was not indebted to the Bank. The debtor, however, was indebted to the Bank at all times relevant herein.

hereafter existing or acquired under purchased title or documents of title and all proceeds ... thereof included but not limited ... to all accounts receivable arising therefrom ...." The perfection of this security agreement is not challenged by the trustee.[2]

The Bank held a variety of claims against the debtor when the bankruptcy petition was filed. A claim for $180,487.82, based on eight promissory notes executed under the floor plan financing arrangement, was secured by sixteen automobiles. After the automatic stay was vacated the Bank enforced its security agreement by selling these automobiles. A deficiency of $13,765.76 remains. A second claim arises from the debtor's practice of purchasing its own inventory vehicles, financing the purchases with the Bank, and then leasing the vehicles to customers. Rights under the lease agreements were assigned to the Bank by the debtor. Exercise by the lessees of a purchase option on three of the leased vehicles resulted in a net postpetition loss by the Bank of $1,683.49. Additionally, the whereabouts of another vehicle financed by the Bank and leased by the debtor, without the Bank's consent, are unknown. The balance due the Bank on this third claim totaled $5,569.28 when the debtor's bankruptcy petition was filed. A fourth claim is attributable to the Bank's prepetition purchase of chattel paper representing the retail installment sale of a 1977 Toyota van. The Bank obtained a postpetition judgment against the debtor since the retail installment contract was not enforceable against the purported buyer. Because the debtor double financed the Toyota van, the Bank, whose security interest was inferior to that of another bank, sustained a net loss of $4,793.71.[3] A fifth claim arises from the debtor's prepetition issuance to the Bank of two checks, in the combined sum of $2,981.35, returned for insufficient funds. Proofs of claim with respect to these five claims, totaling $28,793.59, have been filed by the Bank.

Additionally, when the debtor filed its bankruptcy petition on December 17, 1981, the Bank held chattel paper (representing retail installment contracts not in default) purchased from the debtor having a value of $830,313.00. As a result of installment payments through October 30, 1983, the value of this chattel paper has been reduced to $167,608.00. However, between the petition date and October 30, 1983, the Bank experienced losses in the aggregate amount of $10,141.34 due to deficiencies from the sale of automobiles it repossessed. Also, the Bank has paid $4,648.78 in interest rebates and refunds to installment buyers who prepaid their retail purchase contracts. The sum of these two amounts, $14,790.12, would have been paid from the reserve account at issue if the deficiencies or the rights to refunds had arisen prepetition. No formal proof of claim for this sum has been filed, but the validity of the indebtedness is stipulated.

The combined total of all these claims, $43,583.71, slightly exceeds the balance in the reserve account. This combined total does not include an amount representing the Bank's projected loss on the remaining unpaid retail installment contracts or its attorney fees, both of which the Bank claims are chargeable to the reserve account.[4]

II

Bankruptcy Code § 542(b) provides in relevant part:

> [A]n entity that owes a debt that is property of the estate and that is ma-

---

2. Although the parties did not so stipulate, the trustee states that the court has previously determined a financing statement was filed perfecting the Bank's interest in the collateral described in the July 30, 1981, security agreement. Contrary to the representation in the Bank's brief, a copy of the financing statement is not among the exhibits to the parties' stipulation.

3. See *Hamilton Bank v. Bank of Commerce (In re Morristown Lincoln-Mercury, Inc.)*, 25 B.R. 377 (Bankr.E.D.Tenn.1982).

4. Based on its previous experience with chattel paper purchased from the debtor, the Bank anticipates a loss of $3,300.00 on these unpaid retail installment contracts.

tured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C.A. § 542(b) (1979).

With exceptions immaterial herein, Code § 553 enacts in part:

*Setoff* (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ....

11 U.S.C.A. § 553(a) (1979).

The Bank concedes that the dealer reserve account is property of the debtor's estate, 11 U.S.C.A. § 541 (1979). The critical dispute is whether some of the Bank's claims against the debtor arose before the commencement of the bankruptcy case.

Code § 553 continues the recognition in bankruptcy law of the "possible injustice" in compelling a creditor to pay his indebtedness in full to the debtor when his claim against the debtor will be only partially paid, if at all. 4 *Collier on Bankruptcy* ¶ 553.02, 553–10 (15th ed. 1984).[5] The provision merely preserves setoff rights existing under nonbankruptcy law.

 Three elements are necessary to establish a creditor's setoff right:

(1) a debt owing by the creditor to the debtor which arose before commencement of the case;

(2) a claim of the creditor against the debtor which also arose before commencement of the case; and

(3) the debt and claim must be mutual obligations.

5. *See also Prudential Ins. Co. of America v. Nelson (In re Chickamauga Trust Co.),* 101 F.2d 441, 443 (6th Cir.1939), *cert. denied,* 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 489 (1939):

*Waldschmidt v. Columbia Gulf Transmission Co. (In re Fulghum Constr. Corp.),* 23 B.R. 147, 151 (Bankr.M.D.Tenn.1982). A "debt" is a liability on a "claim." 11 U.S.C.A. § 101(11) (1979). "Claim" is very broadly defined in the Bankruptcy Code and means, in part, "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ...." 11 U.S.C.A. § 101(4) (1979). Mutuality of obligation simply means that the creditor is indebted to the debtor who likewise owes a debt to the creditor; something must be owed by both sides. 4 *Collier on Bankruptcy* ¶ 553.-04[2], 553–15 (15th ed. 1984). The claims between the parties must be owing and due in the same capacities. *Bank of Dixie v. Gentry (In re Todd),* 37 B.R. 836 (Bankr. W.D.La.1984) (setoff against note of debtor to bank from funds in his IRA denied because IRA was obligation from bank as trustee for debtor, not merely an obligation from bank to debtor).

Taking into account postpetition events (liquidation of security, losses on leased vehicles through exercise of purchase options, and rebates for prepayments), the Bank contends it held the following claims, previously discussed, against the debtor when the petition was filed:

| Source of Claim | Amount |
|---|---|
| Floor plan financing deficiency | $13,765.76 |
| Chattel paper losses | 10,141.34 |
| Interest rebates or refunds | 4,648.78 |
| Loss on leased vehicles purchased by lessees | 1,683.49 |
| Financing of vehicle, now missing, leased without Bank's consent | 5,569.28 |
| Judgment for double financing of vehicle | 4,793.71 |
| NSF checks | 2,981.35 |

The trustee contends that as of the petition date the debtor's liability was determinable only with respect to the last three claims, totaling $13,344.34. Asserting that the

"The principle upon which the rule [of setoff] proceeds is that in case of mutual debts, it is only the balance which is the real and just sum owing by or to the bankrupt."

debtor's ultimate liability on the four remaining claims is attributable to postpetition events, the trustee maintains these claims are not properly subject to setoff against the dealer reserve account.

As authority for his position the trustee cites *In re Howell*, 4 B.R. 102 (Bankr.M.D. Tenn.1980), a chapter 13 case in which the Department of Labor sought to recoup prepetition overpayments by withholding $400.00 monthly from postpetition disability payments it made to the debtor. In denying the asserted setoff Judge Jennings wrote:

> The filing of the petition fixes "the line of cleavage with reference to the condition of the bankrupt estate" .... Only debts or credits existing at the time of filing can be setoff against the other and transactions occurring later cannot be taken into account. *Bramham v. Lanier Bros.*, 138 Tenn. 702, 200 S.W. 830 (1918).

*In re Howell*, 4 B.R. at 108.

Setoff was denied in both *Howell* and *Bramham* because the creditor in each case sought to set off a liability arising *after* the commencement of the case against its prepetition claim.[6]

██ The trustee also relies upon *Thompson v. Citicorp Person to Person Fin. Center, Inc. (In re American Motor Home Rentals, Inc.)*, 10 B.R. 53 (Bankr.W.D.Mo. 1981), a case involving a "dealer reserve fund" consisting of the excess in finance charges exacted by the debtor over those charged by Citicorp, who purchased installment contracts from the debtor.[7] The parties' agreement[8] permitted Citicorp to hold and apply all reserves to any indebtedness of the debtor until all contracts purchased from the debtor were liquidated. Accumulated credits in the fund in excess of $4,000.00, however, were payable monthly to the debtor. When the debtor's bankruptcy petition was filed, the balance in the fund was $10,550.64. Nonetheless, Citicorp resisted the trustee's request for a turnover order on the basis it was entitled to a $13,500.00 setoff. However, Citicorp failed to establish the validity of its claim underlying its asserted setoff right. After concluding the trustee was clearly contractually entitled to any amount in excess of $4,000.00 in the fund, the court also found that Citicorp was not entitled to any portion of the $4,000.00 remaining in the fund. The opinion recites in part:

> [A]s of the date of the order for relief ... the events which would further reduce the balance of the Hold Reserve Account had not yet occurred. According to the testimony ... some had occurred after the date of the order for relief ... and others were, as of the dates of the hearing of this action, expected to happen. But this account must be reckoned to have been terminated as of the date of the order for relief herein. For ... under section 553 of the Bankruptcy Code, a setoff against the bankruptcy estate cannot be exercised on the basis of a claim arising after bankruptcy. (Footnote omitted.)

*American Motor Home Rentals*, 10 B.R. at 57.

This court agrees that Code § 553 clearly prohibits the setoff of a postpetition claim against a debtor's prepetition liability. However, Code § 553 does not prohibit setoff of a creditor's claim arising prepetition, unliquidated or unmatured as of the petition date, against a debtor's prepetition claim. *Whitman v. SeedTec Int'l Inc.*, 38 B.R. 395 (Bankr.N.D.1984); *Traders Bank v. Stonitsch (In re Isis Foods, Inc.)*, 24 B.R. 75 (Bankr.W.D.Mo.1982). Furthermore, a contingent claim which arises prior to the commencement of a bankruptcy case may be set off against a prepetition claim

---

6. The Department of Labor was not indebted to the debtor in *Howell* as of the petition date. Any right of the debtor to payment which the Department of Labor might have set off against the prepetition overpayment accrued postpetition. Hence, setoff was disallowed.

7. In fact, Nationwide Financial Corporation purchased the debtor's installment contracts. However, Nationwide assigned its rights therein to Citicorp.

8. See note 7, *supra*.

of the debtor's estate. 4 *Collier on Bankruptcy* ¶ 553.11 (15th ed. 1984).

In a second Missouri case involving a dealer reserve account, *Stonitsch v. Commerce Bank (In re Amco Products, Inc.),* 17 B.R. 758 (Bankr.W.D.Mo.1982), the trustee recovered the balance in the account as of the petition date, plus interest. The account was a general deposit for a special purpose as opposed to a trust fund. Setoff was denied, however, because the creditor's claims against the reserve account were not matured as of the petition date. According to Judge Barker, under Missouri law a bank is not entitled to set off unless the debt of its depositor has matured.[9] The rule in Tennessee is otherwise—a bank may set off general deposit funds against the note of an insolvent even though the note has not matured. *Conquest v. Broadway Nat'l Bank,* 134 Tenn. 17, 183 S.W. 160 (1916); *Nashville Trust Co. v. Fourth Nat'l Bank,* 91 Tenn. 336, 18 S.W. 822 (1892).

### III ·

■ The dealer reserve account is a general deposit for a special purpose, not a trust fund. The funds deposited in the account were not segregated from other general deposits, and the Bank was not restricted from using the funds in its operations. Hence, the relationship between the Bank and the debtor with respect to the reserve account is that of debtor and creditor. *New York County Nat'l Bank v. Massey,* 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904); *Conquest v. Broadway Nat'l Bank,* 134 Tenn. 17, 183 S.W. 160 (1916). The debtor's right to the reserve account funds, however, was contingent and unmatured on the petition date under the terms of its "Repurchase Agreement (Retention Plan)" with the Bank.[10] Likewise the Bank's claims for postpetition chattel paper losses and interest rebates or refunds, both chargeable to the dealer reserve account, were also contingent when the debtor's case was commenced. The debtor was absolutely liable with respect to the Bank's five remaining claims.[11]

*Collier* recites in material part:

> [I]t is well settled that where ... a trustee lays claim to funds of the debtor on deposit with a bank; the bank may assert a setoff to the extent of its claim against the debtor on the latter's note, even though the debtor's obligation is not presently due. (Footnote omitted.)

4 *Collier on Bankruptcy* ¶ 553.10, 553–51 (15th ed. 1984).

Of course, this general proposition presupposes a right of setoff exists under applicable nonbankruptcy law. Under Tennessee law a bank is entitled to set off an unmatured obligation of an insolvent depositor against a general deposit held by the bank. *Conquest v. Broadway Nat'l Bank,* 134 Tenn. 17, 183 S.W. 160 (1916); *Nashville Trust Co. v. Fourth Nat'l Bank,* 91 Tenn. 336, 18 S.W. 822 (1892). (The debtor's liabilities substantially exceeded its assets when its petition was filed.)

■ The Bank's indebtedness to the debtor clearly arose previous to the commencement of the debtor's case. Likewise all seven of the Bank's claims against the debtor arose from prepetition agreements between the Bank and the debtor. As of the petition date the debtor was liable to the Bank on each of its claims. The character of a claim is not transformed from

---

9. *Contra Traders Bank v. Stonitsch (In re Isis Foods, Inc.),* 24 B.R. 75 (Bankr.W.D.Mo.1982).

10. Paragraph 8 of this agreement recites in apposite part:

> "If for any reason you stop buying our contracts ... you may hold any reserve ... until all contracts purchased from us and all our outstanding obligations to you have been fully paid ...."
>
> "If we are in default to you ... or if we cease doing business as a going concern ... you may, at your option, without notice, charge any of our obligations to you against all such reserve ...."

11. Clearly, the debtor's liability was absolute on notes held by the Bank for floor plan financing and for other vehicles financed by the Bank and purchased by the debtor for leasing. The trustee concedes the three other claims may be set off by the Bank against the reserve account.

prepetition to postpetition simply because it is contingent, unliquidated, or unmatured when the debtor's petition is filed. *See* 4 *Collier on Bankruptcy* ¶ 553.01[4], 553–6 (15th ed. 1984); 2 *Norton Bankr. L. & Prac.* § 33.01 (1981). Further, the mutuality requirement is satisfied in this case. When the petition was filed, the Bank and the debtor were indebted to one another in the same capacity.

Pursuant to 11 U.S.C.A. § 362(d) (1979), relief from the automatic stay is appropriate to allow the Bank to set off the entire balance in the reserve account, $43,343.05, against its aggregate claim of $43,583.71. Accordingly, it is not necessary for the court to consider the Bank's contention that it either has a perfected security interest or pledge rights entitling it to the dealer reserve account funds.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.