### In re A & B HOMES, LTD., Debtor.

### Sherman B. LUBMAN, Trustee for A & B Homes, Ltd., Plaintiff,

v.

### SOVRAN BANK, N.A., Defendant.

**Bankruptcy No. 87–01126–R.**
**Adv. No. 88–0032–R.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 24, 1989.

Stephen A. Chaplin, Chaplin, Papa & Gonet, Richmond, Va., for plaintiff.

Leroy R. Hamlett, Jr., Michie, Hamlett, Lowry, Rasmussen & Twell, P.C., Charlottesville, Va., for defendant.

MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter came before the Court upon the complaint of the trustee seeking an

order of the Court compelling the defendant, Sovran Bank, N.A. ("Sovran"), to turn over certain funds alleged to be property of the estate of the above-named debtor. Finding the trustee's claim to the funds to be without merit, the Court finds that the trustee's complaint must be denied.

## FINDINGS OF FACT

Before submitting the case for decision on memoranda of law, the parties stipulated to the operative facts. On January 22, 1976, A & B Homes, Ltd. ("A & B") and Virginia National Bank (which became Sovran on January 1, 1985) entered into a "Dealer Agreement–Mobile Homes." This Agreement permitted the debtor to sell its chattel paper—in this case conditional sales contracts created upon the sale of mobile homes—to Sovran on a full-recourse basis. Sovran agreed to pay the debtor the face amount of the chattel paper, less a discount, and less a portion which was set aside in a reserve for losses.

The funds held in reserve were placed in a "Hold–Back Account," which the parties agree was at all times under Sovran's exclusive control. From January 22, 1976 until June 13, 1981, the money in the Hold–Back Account did not earn interest, but after that time the Hold–Back Account was converted, upon agreement of the parties, to an interest-bearing passbook savings account (the "Reserve Account"). From June 13, 1981 to the present the passbook was in the sole possession of Sovran, and the debtor was not at any time permitted to make withdrawals from the Reserve Account.

On May 29, 1987, A & B filed its petition for relief under Chapter 7 of the Bankruptcy Code. The parties stipulate that at the time of the filing the Reserve Account contained $29,689.95, and that as of July 1, 1988, the balance in the account was $16,418.51. The parties state that "[t]his balance reflects earnings since the filing date less charges against the account." The Court notes that Sovran has not sought relief from the automatic stay in this case, and the diminishment in Reserve Account funds is inadequately explained. The parties stipulate that as of July 1, 1988, the total amount outstanding of loans evidenced by chattel paper purchased by Sovran was $984,942.48.

The trustee has requested that Sovran turn over the funds contained in the Reserve Account as of the date of the filing of the debtor's petition, claiming that these funds constitute property of the estate. Sovran has refused, contending that it possesses a perfected lien in these funds securing all potential claims against the funds which may arise as a result of nonpayment by mobile home purchasers of indebtedness evidenced by the chattel paper sold by the debtor to Sovran.

## CONCLUSIONS OF LAW

The Court bases its conclusion that the funds in the Reserve Account are not subject to the trustee's request for turnover under 11 U.S.C. § 542 upon several grounds.[1] First, the Court believes that although the estate of the debtor does have a property interest in the funds in the Reserve Account, this interest is contingent in nature and is not, at the present, subject to turnover. Second, the Court concludes that Sovran possesses a valid, properly perfected security interest in the funds in the Reserve Account. And third, the Court holds that Sovran has a valid right of setoff against the Reserve Account, thus exempting the funds from turnover under 11 U.S.C. § 542(b).[2]

---

1. 11 U.S.C. § 542(a) provides:
   ... an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

2. 11 U.S.C. § 542(b) provides:
   ... an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title [*infra*, p. 248] against a claim against the debtor.

## I. Interest of Estate in Reserve Account

■ In seeking the entry of a turnover order, the burden is on the trustee to show that the property or proceeds are part of the bankruptcy estate. *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); *In re Joe Necessary & Sons, Inc.,* 475 F.Supp. 610 (W.D.Va.1979).

The general rule is that "[t]he trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition." *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). The trustee is also granted the powers of a judicial lien creditor as of the date of the bankruptcy and the trustee may avoid any transfer of property or obligation that would be avoidable by a creditor who obtains a judicial lien on all the debtor's property. *See,* 11 U.S.C. Section 544(a)(1).

This Court is in accord with the decision of the Bankruptcy Court for the Western District of Missouri which found, in a factually similar case, that the only property right or interest available to the estate of the debtor is "that potential interest in the account set out in the dealer agreement, *i.e.,* the right to any funds remaining in the account after all contracts are liquidated." *In re Amco Products, Inc.,* 50 B.R. 723, 725 (W.D.Mo.1983).

In the instant case the contract between A & B and Sovran makes clear that, until final payment is made on all of the chattel paper purchased by Sovran, A & B has no rights in the funds maintained in the Reserve Account. From 1981 to the present this account was kept in the form of an interest-bearing passbook savings account. The passbook was at all times in the sole possession of Sovran, and A & B could not make withdrawals from the Reserve Account.

Although the Court concludes that the bankruptcy estate does possess an interest in the Reserve Account, and that it is estate property, at the present time the trustee is not entitled to turnover of any funds in the Reserve Account. This is because the estate's interest is limited to the potential that upon final liquidation of all chattel paper sold by A & B to Sovran, under which there are presently outstanding obligations of nearly one million dollars, Sovran will not be required to use the funds in the Reserve Account to offset losses arising from nonpayment of the paper. For this reason, the Court cannot order Sovran to turn over those funds, if any, contained in the Reserve Account in which the trustee has an interest until such time as all of the outstanding debts evidenced by the chattel paper are liquidated and Sovran's losses are determined.[3]

## II. Sovran's Security Interest In Reserve Account Funds

■ As a preliminary matter, the Court notes, and the parties agree, that this case does not arise under Article 9 of the Uniform Commercial Code ("UCC") as adopted by Virginia. Va.Code Ann. § 8.9–101 et seq. (1950). Article 9 specifically excludes deposit accounts, such as the Reserve Account in question in this case, from its ambit. Also, it appears to the Court that there is no other Virginia statute which addresses the type of security interest Sovran asserts.

■ Although Article 9 is inapplicable on these facts, the Court concludes that Sovran possesses a properly perfected security interest in the funds in the Reserve Account by way of a common law pledge.

---

**3.** Without deciding the issue, the Court points outs that a turnover order might be supported prior to the final liquidation of all chattel paper. Suppose, for example, that the Reserve Account contained $50,000.00 at a time when a total of only $30,000.00 in potential losses remained outstanding. In such a situation, the trustee might successfully argue for the turnover of $20,000.00.

The Court also notes that the issue of whether the trustee may have been entitled to turnover upon the provision of adequate protection of Sovran's interest did not arise in this case. The Court's records do not reflect that the trustee at any time proffered such protection.

The trustee's contentions that the promulgation of the UCC swept away the common law forms of secured transactions, and that the pledge doesn't exist in Virginia because no Virginia cases directly recognize it are simply meritless.

First, the drafters of the UCC expressly recognized that certain "transactions are quite special, do not fit easily under a general commercial statute and are adequately covered by existing law." Va.Code Ann. Section 8.9–104, Official Comment, Para. 7. Thus, as the parties agree, the drafters specifically excluded "transfer[s] in whole or in part of any of the following: . . . any deposit, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization." Va.Code Ann. Section 8.9–104(k).

Second, the mere absence of any explicit discussion of the pledge in the Virginia cases is no proof at all that the pledge has no life in the Commonwealth.[4] The pledge is a common law security device, and exists outside statutory or case law. In fact, Virginia expressly recognizes the continued validity of the common law of England as the rule of decision in the Commonwealth. Va.Code Ann. Section 1–10 (1950). As such only a statute affirmatively abrogating the pledge, or a Virginia court decision announcing its demise, would lead this Court to believe that the pledge, a security device developed at common law, has ceased to enjoy continued vitality.

The Restatement of the Law, Security, Section 1, p. 5, defines the common law pledge as follows:

> A pledge is a security interest in a chattel or in an intangible represented by an indispensable instrument, the interest being created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty.

Comment (e) to the Restatement section defines "indispensable instrument" as meaning the formal written evidence of a interest in intangibles so representing the intangible that the enjoyment, transfer, or enforcement of the intangible depends upon the possession of the instrument. The comment states that:

> [I]ndispensable instruments include not only negotiable instruments such as promissory notes and bills of exchange, but also share certificates, bonds, interim certificates, *savings bank books* and insurance policies.

(emphasis supplied).

In a factually similar case, the Supreme Court of West Virginia concluded that "where . . . a bank, by agreement with its depositor, creates a reserve account with the depositor's funds as security for loans made by the bank to the depositor, and retains the exclusive possession and control over the account, such account meets the requirements of a common law pledge." *Duncan Box & Lumber Co. v. Applied Energies, Inc.*, 165 W.Va. 473, 270 S.E.2d 140, 145–46 (1980). *See also, Walton v. Piqua State Bank*, 204 Kan. 741, 466 P.2d 316, 329 (1970) (savings account proper subject of pledge and may be placed in possession of pledgee by delivery of passbook or by written assignment).

In the instant case, the Court holds that Sovran retains a valid security interest in the Reserve Account by way of a common law pledge.[5] This interest is properly perfected by Sovran's possession and control of the passbook representing the account. Because a properly perfected common law pledge, such as Sovran holds, prevails over the claims of other secured parties and

---

**4.** The Court notes that in at least two reported decisions the Supreme Court of Appeals of Virginia has discussed *in passim* the pledge as one sort of collateral security. *Federal Deposit Insurance Corp. v. Mapp's Ex'r*, 184 Va. 970, 37 S.E.2d 23, 26 (1946); *Smith v. Coleman*, 184 Va. 259, 35 S.E.2d 107, 112 (1945) ("Collateral security means secondary or subsidiary. Such security is to be resorted to only in the event that the pledgor fails to perform the principal contract. A pledge as collateral security *ex vi termini* excludes the idea that the thing pledged is de-

signed as the primary source from which payment is to be made.").

**5.** The Court notes that, although it is not dispositive of the issue, the "Dealer Agreement—Mobile Homes" which was signed by Sovran's predecessor and A & B states, in clause 6: "We pledge any rights we have in this Hold–Back account as collateral for any of our obligations to you, current or hereinafter acquired."

judgment lien holders, the Court must deny the trustee's demand that Sovran turn over the Reserve Account Funds. *See Duncan, supra* 270 S.E.2d at 145–46.

### III. Sovran's Right to Set Off

■ Section 553 of the Bankruptcy Code provides, in pertinent part, that:

> [The Bankruptcy Code] does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

11 U.S.C. § 553(a). Thus, the Bankruptcy Code preserves those rights to setoff which exist outside bankruptcy. *In re Britton*, 83 B.R. 914, 917 (Bankr.E.D.N.C.1988), *citing* 4 *Collier on Bankruptcy* Para. 553.01 (L. King 15th Ed.1987). The basic doctrine of setoff arose as a practical tool to eliminate unnecessary transactions between parties holding mutual debts. The Supreme Court has stated that setoff "is grounded on the absurdity of making A pay B when B owes A." *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913).

In the absence of a recognition of the right to a setoff, the creditor in a bankruptcy context might be forced to pay *in full* the amount owed to the debtor, but be limited to no more than a pro rata recovery of his claim against the debtor. The process of imposing this loss on an otherwise innocent party has historically been thought to be improper. *In re Braniff Airways, Inc.*, 42 B.R. 443, 448 (Bankr.N. D.Tex.1984) *citing* 2 *Norton Bankr.L. & Prac.* § 33.01.

There are three elements necessary to establish a creditor's right to a setoff:

> 1) a debt owing by the creditor to the debtor which arose before the commencement of the case;
>
> 2) a claim of the creditor against the debtor which also arose before commencement of the case; and
>
> 3) mutuality of the debt and claim.

11 U.S.C. § 553(a); *In re Morristown Lincoln–Mercury, Inc.*, 42 B.R. 413, 416 (Bankr.E.D.Tenn.1984); *In re Fulghum Const. Co.*, 23 B.R. 147, 151 (Bankr.M.D. Tenn.1982); *In re Taylor Motors*, 60 B.R. 760, 763 (Bankr.D.Nev.1986). A "debt" is a liability on a "claim." 11 U.S.C. § 101(11). "Claim" is very broadly defined in the Bankruptcy Code and means, in part, "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(4). Mutuality of obligation simply means that the creditor is indebted to the debtor who likewise owes a debt to the creditor, i.e. something must be owed by both sides. 4 *Collier on Bankruptcy* Para. 553.04[2], 553–15 (15th ed. 1984). The claims between the parties must be owing and due in the same capacities. *Morristown Lincoln–Mercury, supra* at 416; *In re Fred Sanders Co.*, 33 B.R. 310, 311 (Bankr.E.D.Mich.1983). This does not mean that the debts and claims must be of the same character. *Braniff Airways, supra* at 447; *In re Lott*, 79 B.R. 869, 870 (Bankr.W.D.Mo.1987).

The trustee contends in the instant case that Sovran is forbidden from setting off any claims arising under the chattel paper against funds held in the Reserve Account. This contention is based upon the trustee's apparent belief that such claims, resulting from non-payment or other defaults on obligations represented by the chattel paper, would be post-petition claims. While 11 U.S.C. § 553 prohibits the setoff of a creditor's post-petition claim against the creditor's prepetition liability to the debtor, § 553 does not prohibit setoff of a creditor's claim arising prepetition, unliquidated or unmatured as of the petition date, against a creditor's prepetition liability. *Morristown Lincoln–Mercury, supra* at 417. Furthermore, the court in *In re Isis Foods, Inc.*, 24 B.R. 75, 76–77 (Bankr.W.D. Mo.1982) stated: "Although it has sometimes been held that a bank may not exercise a pre-bankruptcy setoff with respect to unmatured claims against the debtor, a post-bankruptcy set off with respect to an

unmatured claims has been approved as a matter of hornbook law." The generally accepted principle is that a claim, which is unmatured, unliquidated, or even contingent on the date of the filing of the petition is still considered a pre-petition claim. If a debt is absolutely owed, but not presently due, or definitely liable, but unliquidated, it is still a prepetition debt. *Braniff Airways, supra* at 451. Thus, the right of setoff may be asserted, even though at the time the petition in bankruptcy is filed the debts involved have not been liquidated. *Fred Sanders, supra* at 312. *See also, Luther v. United States,* 225 F.2d 495 (10th Cir.1954).

Once a right to setoff is established, there are nevertheless certain restrictions in asserting the right. The Bankruptcy Code provides that filing of a petition operates as an automatic stay against the setoff of any debt owing to the debtor that arose before the commencement of the case against any claim against the debtor. 11 U.S.C. § 362(a)(7). It is well settled that the automatic stay prohibits the exercise of the right of setoff, but does not prohibit the right to setoff itself. *In re Conti,* 50 B.R. 142, 149 (Bankr.E.D.Va.1985). *See also In re Handy,* 41 B.R. 172 (Bankr.E.D. Va.1984); *Kenney's Franchise Corp. v. Central Fidelity Bank,* 22 B.R. 747, 748 (Bankr.W.D.Va.1982); *In re Terry,* 7 B.R. 880, 882 (Bankr.E.D.Va.1980). Courts have allowed a creditor to seek relief from the stay in order to exercise setoff rights prior to discharge. *Id. See also United States v. Norton,* 717 F.2d 767, 773 (3d Cir.1983); *United States v. Powers,* 28 B.R. 86 (Bankr.E.D.Pa.1983). Thus, the holders of valid setoffs may not execute them without obtaining relief from the automatic stay. *In re Ohning,* 57 B.R. 714, 716 (Bankr.N. D.Ind.1986).

In light of the facts of the present case, it is apparent that Sovran has shown the necessary prerequisites to establish a right to setoff. First, there is a debt owing by Sovran to A & B which arose before the commencement of the case. This is evidenced by the fact that the reserve account represented an indebtedness by Sovran to A & B.

Second, Sovran holds claims against A & B which arose before the commencement of the case. These claims are evidenced by the chattel paper bought by Sovran from A & B, along with the express agreement that A & B would be liable for any deficiency or defaults arising under the chattel paper. Such deficiencies and defaults exist in some of the chattel paper purchased by Sovran, thereby giving Sovran a number of liquidated, noncontingent claims against A & B. The fact that as of the time of the filing of the petition, some of Sovran's other claims were unliquidated, contingent, unmatured, or disputed is of no consequence. The broad definition of claim in 11 U.S.C. § 101(4) permits Sovran to satisfy the second element necessary for setoff.

Third, the requirement of mutuality of obligation has been met. Sovran is indebted to A & B and A & B is likewise indebted to Sovran, and these debts arise out of the parties' agreement to carry out transactions relating to A & B's sale of mobile homes.

## IV. CONCLUSION

As a result of the Court's findings that Sovran has a valid, properly perfected security interest in the funds held by it in the Reserve Account, that Sovran possesses a right to set off claims it has against A & B against those funds, and that the estate's interest in those funds is limited to the possibility that after all Sovran's claims are liquidated some money may remain in the Reserve Account, the Court must deny the trustee's request for a turnover order.

An appropriate Order will issue.