In re Petition of Alison J. TRECO and David Patrick Hamilton, as Liquidators of Meridien International Bank Limited (In Liquidation).

Bankruptcy No. 95 B 44326(JLG).

United States Bankruptcy Court, S.D. New York.

Jan. 22, 1999.

2. An order consistent with this decision has already been entered.

Stroock & Stroock & Lavan LLP, New York City, for Liquidators.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Bank of New York and JCPL Leasing Corp.

*DECISION ON LIQUIDATORS' MOTION FOR PARTIAL SUMMARY JUDGMENT*

JAMES L. GARRITY, Jr., Bankruptcy Judge.

In this ancillary case under § 304 of the Bankruptcy Code, Alison J. Treco and David Patrick Hamilton, the official liquidators ("movants") of Meridien International Bank Limited (In Liquidation) ("MIBL"), seek partial summary judgment directing the turnover of funds contained in certain bank accounts maintained in MIBL's name at the Bank of New York ("BNY"). BNY, JCPL Leasing Corp. ("JCPL") and the Deposit Insurance Board ("DIB"), as assignee of Meridien BIAO Bank Tanzania Limited ("Meridien Tanzania"), oppose the motion. Additionally, BNY and JCPL ask us to grant them summary judgment dismissing this case. · We grant movants' motion and deny BNY's and JCPL's request for relief.

### Facts

The following facts are not in dispute. MIBL is a bank incorporated under the laws of the Bahamas. It has conducted business in the Bahamas, Africa and various other jurisdictions, including the United States.

In or about June 1993, MIBL entered into a loan agreement with BNY. Pursuant to a June 15, 1993 pledge agreement (the "MIBL Pledge"), MIBL pledged certain of its bank accounts (the "MIBL Accounts") as security for that loan. In late 1993, BNY agreed to permit MIBL to overdraw its account. As security for those overdrafts, and pursuant to a November 15, 1994 agreement (the "Pledge Agreement"), Meridien Tanzania pledged BNY certain of its accounts at BNY (the "Pledged Accounts"). The Pledge Agreement permitted BNY to set off funds on deposit in the Pledged Accounts against MIBL's loan obligations if at any time BNY deemed itself to be insecure. BNY's credit accommodations to MIBL ultimately aggregated in excess of $15,000,000.

On or about March 28, 1995, Meridien BIAO Bank of Swaziland Limited commenced an involuntary liquidation proceeding against MIBL in the Supreme Court of the Bahamas pursuant to the Bahamian Companies Act of 1992 (the "Companies Act") and the Companies (Winding–Up) Rules (the "Winding–Up Rules"). By order dated April 25, 1995 (the "Winding–Up Order"), the court directed that MIBL be placed into compulsory liquidation, and appointed movants as the bank's official liquidators.

Effective March 28, 1995, BNY applied all of the funds in the Pledged Accounts to satisfy MIBL's outstanding indebtedness. In April 1995, the Central Bank of Tanzania appointed a Manager to operate Meridien Tanzania. The Manager questioned the validity of the Pledge Agreement and demanded that BNY return the $15 million it had liquidated from the Pledged Accounts.

In June 1995, BNY and JCPL commenced an action in the United States District Court for the Southern District of New York (the "district court") against MIBL, Meridien Tanzania, DIB and certain other entities. In that action, they seek, among other things, (i) a declaratory judgment rejecting Meridien Tanzania's claim for the return of the $15,-150,000 in the Pledged Accounts and declaring that BNY can retain this money in satisfaction of amounts owed to it by MIBL, (ii) "in the nature of interpleader", recovery of amounts owed to BNY from the proceeds from the sale of certain aircraft and spare parts, and (iii) also "in the nature of interpleader", a declaratory judgment that BNY, in the event it does not prevail on its other causes of action, can apply against amounts owed to it by MIBL, the funds on deposit in the MIBL Accounts, among others.

DIB, as Meridien Tanzania's assignee, moved for partial summary judgment directing BNY to turnover the Pledged Accounts. The district court denied that motion. On June 22, 1998, after trial of the dispute in the district court, and while the matter was *sub judice*, DIB and BNY entered into a settlement agreement (the "Tanzania Settlement") pursuant to which BNY, among other things, agreed to pay DIB $4,000,000, plus attorneys' fees in full satisfaction of all claims. BNY made the initial installment payment under that agreement in August of 1998.

On September 29, 1995, movants commenced this case by filing a petition on

MIBL's behalf under § 304 of the Bankruptcy Code. Among other things, in the petition, movants seek an order directing all persons or entities possessing MIBL's assets to turn over those assets, or the proceeds thereof, to them. In this motion, they seek partial summary judgment on their § 304 petition directing BNY to turnover all funds in the MIBL Accounts.

### Discussion

We have subject matter jurisdiction over this case pursuant to 11 U.S.C. § 304 and 28 U.S.C. §§ 1334 and 157 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A).

Section 304 empowers a "foreign representative" appointed in a "foreign proceeding" to commence a "case ancillary to [that] foreign proceeding" by filing a petition in the bankruptcy court. 11 U.S.C. § 304(a). *See Koreag, Controle et Revision S.A. v. Refco F/X Associates, Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 348 (2d Cir. 1992), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *In re Rubin,* 160 B.R. 269, 274 (Bankr.S.D.N.Y.1993). A "foreign proceeding" is "[a] proceeding, whether judicial or administrative . . . for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization." 11 U.S.C. § 101(23). A "foreign representative" is a "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." 11 U.S.C. § 101(24).

In relevant part, § 304 states that "after trial [on an ancillary petition], the court may . . . order turnover of the property of such estate, or the proceeds of . . . [the foreign debtor's] property, to such foreign representative." 11 U.S.C. § 304(b)(2). In determining whether to grant relief under § 304(b)(2), we are guided by what will best assure an economical and expeditious administration of the foreign debtor's estate, consistent with the specific criteria delineated in § 304(c). Five of those factors are relevant here:

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent ·dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; and

(5) comity.

11 U.S.C. § 304(c).[1]

Movants contend that MIBL is the subject of a foreign proceeding, that they are duly qualified foreign representatives and that they merit relief in the form of a turnover order under §§ 304(b)(2) and (c). According to them, the MIBL Accounts are property of MIBL's estate which must be administered in MIBL's Bahamian liquidation proceeding. They maintain that we can insure the just treatment of all creditors only by repatriating the MIBL Accounts to the Bahamas because otherwise MIBL's estate will be dismembered and it will be impossible to distribute MIBL's estate in a fair and equitable way. Movants argue that U.S. creditors like BNY will not be unduly prejudiced or inconvenienced if we grant this motion because the claims processing and distribution procedures under the Companies Act are fundamentally fair and substantially in accordance with the order prescribed in the Bankruptcy Code. They urge that the relief they seek will prevent BNY from being preferred unfairly and to the detriment of other creditors. Finally, movants assert that principles of comity mandate that we grant their motion and order turnover of the MIBL Accounts.

BNY and JCPL make two preliminary arguments in opposition to the motion. First, they contend that we must deny it as

---

1. The sixth factor is inapplicable because it concerns "the provision of an opportunity for a fresh start for the individual that such foreign proceed-ing concerns." 11 U.S.C. § 304(c)(6). *See In re Gercke,* 122 B.R. 621, 634 (Bankr.D.D.C.1991).

premature because MIBL failed to comply with its discovery demands. That aspect of the motion is moot because the parties have resolved their discovery disputes. Second, they contend that we must deny this motion as procedurally defective because movants cannot obtain a turnover order without commencing an adversary proceeding, notwithstanding that movants' petition specifically alleges that they are seeking a turnover order and identifies the MIBL Accounts as MIBL assets. In *In re Petition of Alain Rukavina*, 227 B.R. 234 (Bankr.S.D.N.Y. 1998), BNY urged us to deny the petitioner's motion under § 304(b)(1) of the Bankruptcy Code for a preliminary injunction because he had not commenced an adversary proceeding seeking injunctive relief. *Id.* at 239–40. We rejected that argument finding that neither the Bankruptcy Code, Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, nor case law supported BNY's assertion. *Id.* Rather, we read § 304(b) to provide that the petition commencing the ancillary case is the pleading pursuant to which a movant can seek relief under § 304. *Id.* BNY makes the same arguments here and we reject them for the reasons we stated in *Rukavina.*

Fed.R.Bankr.P. 7056 makes Fed.R.Civ.P. 56 applicable here. Rule 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). A fact is "material" only if it will affect the outcome of a lawsuit under applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable finder of fact could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Rovtar v. Union Bank of Switzerland*, 852 F.Supp. 180 (S.D.N.Y.1994). In assessing the merits of a summary judgment motion, we must view the record in the light most favorable to the non-

moving party. *See, e.g., Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989). We must determine " '[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Kulak v. City of New York*, 88 F.3d 63, 70 (2d Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–52, 106 S.Ct. at 2512); *see also Heyman v. Commerce & Industry Insur. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975) ("on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried"). The movant must establish that no issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

BNY and JCPL argue that we must deny this motion for the same reasons the district court denied DIB's summary judgment motion. As noted, in that action BNY was seeking a determination that its rights to the funds in the Pledged Accounts are superior to Meridien Tanzania's right to those funds. DIB sought summary judgment regarding the ultimate disposition of the Pledged Accounts. The court denied the motion because it concluded that there was a question as to the validity of the Pledge Agreement, and that this question needed to be answered before the court could make an appropriate disposition of the Pledged Accounts. The issues here are different. We must determine whether the MIBL Accounts are property of MIBL's estate and, if so, whether we should order BNY to turn them over to movants and direct BNY to pursue any claim against MIBL in the Bahamas. We are not being asked to distribute the MIBL Accounts. Moreover, in denying DIB's motion, the district court did not hold that the assertion of a right of set off in the funds will defeat movants' request for an order directing the turnover of the funds in the account.

BNY and JCPL contend that the following disputed material issues of fact preclude us from granting this motion:

(1) Whether the MIBL Accounts are MIBL's property where, under its pledge, MIBL pledged all of said ac-

counts to BNY as security for all of MIBL's present and future obligations, or whether they are the property of BNY or some other party;[2]

(2) Whether MIBL has been unjustly enriched, preventing turnover of the pledged MIBL Accounts under the doctrine of constructive trust, or otherwise;

(3) Whether the MIBL Pledge and the claims by MIBL for turnover of the accounts are a "single transaction" for purposes of the doctrine of recoupment;

(4) Whether a constructive trust should be imposed on the MIBL Accounts for the benefit of BNY or another party;

(5) Whether granting the relief sought by movants will best assure an economical and expeditious administration of MIBL's estate; and

(6) Whether this § 304 case was commenced by MIBL in bad faith to subvert the purposes of § 553 of the Bankruptcy Code and thereby deprive BNY of its statutory and contractual rights of offset pursuant to § 151 of the New York Debtor and Creditor law.

Each of these purported issues of fact actually calls for a legal determination predicated upon facts that are not in dispute. As to BNY's bad faith argument, nothing in the Bankruptcy Code prevents a debtor from filing for relief merely because by so doing a creditor is prevented from exercising a right of offset. Debtors routinely file for bankruptcy to prevent one or more creditors from at least temporarily exercising their non-bankruptcy collection remedies. In any case, BNY cites no authority to support its position and we are aware of none. Thus, we find that this dispute is ripe for summary judgment.

When movants filed this motion, BNY and DIB each contended that it held a contingent claim against MIBL in excess of $15,000,000, and they were litigating with one another in the district court over whether BNY could retain the funds it took from the Pledged Accounts in satisfaction of MIBL's indebtedness to it. If BNY prevailed in that litigation, it would retain the funds in full satisfaction of MIBL's indebtedness, leaving DIB with a claim against MIBL. Conversely, if BNY did not prevail, DIB would have been made whole, leaving BNY as a MIBL creditor. BNY argued that MIBL was not entitled to compel the turnover of the MIBL Accounts until it liquidated its claim against MIBL. Movants argued that BNY had no rights herein because it did not hold a liquidated claim. Those arguments are moot because by virtue of the Tanzania Settlement, BNY holds a liquidated claim against MIBL.

According to BNY, that claim is secured by the Pledged Accounts. Movants deny that BNY is a secured creditor. They contend that when BNY exercised its right under the Pledge Agreement and set off against the funds in the Pledged Accounts, it fully satisfied its claim against MIBL, and thereby ceased to have a security interest in the Pledged Accounts. BNY disputes that analysis but contends, in any event, that if MIBL's debt to it was extinguished in 1995, Meridien Tanzania, as guarantor, was subrogated to all BNY's rights against MIBL, including BNY's right as a secured creditor to retain the funds in the MIBL Accounts pursuant to the MIBL Pledge. Thus, it contends that DIB, as Meridien Tanzania's assignee, is a secured creditor (to the extent of the funds in the MIBL Accounts) and not an unsecured creditor. Further, it maintains that under the Tanzania Settlement, DIB assigned it all of Meridien Tanzania's rights against MIBL, including the rights as a secured creditor that it obtained as BNY's subrogee. MIBL does not deny that BNY is the assignee of Merdien Tanzania's (and DIB's) claims against it.[3] However, MIBL denies that BNY is a secured creditor and contends, in any event, that BNY must pursue DIB's claim against MIBL in the Bahamas, because DIB has filed a claim in the liquidation proceeding. We need not deter-

---

**2.** DIB likewise argues that this is a disputed material issue of fact precluding summary judgment.

**3.** Accordingly, we shall consider DIB's arguments in opposition to the motion as if BNY made them.

mine whether BNY, in its own right, or as assignee of DIB's claims, is a secured creditor because MIBL is entitled to summary judgment even assuming, *arguendo,* that it is a secured creditor.

BNY and DIB each contend that it is the beneficiary of a constructive trust imposed on the MIBL Accounts. Thus, they argue that we must deny this motion because the MIBL Accounts are not MIBL's property. We must consider that issue before we can order that the accounts be turned over. *See Koreag,* 961 F.2d at 349 (whether property is asset of foreign debtor must be determined prior to turnover). In doing so, we apply the laws of the State of New York. *Id.* at 350–51. When MIBL funded the MIBL Accounts, its money ceased to be its property. Rather, that action gave rise to a debtor/creditor relationship between BNY and MIBL, and MIBL's property consisted of BNY's promise to pay. *See Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 20, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) (citing *Bank of Marin v. England,* 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966); *Keller v. Frederickstown Sav. Institution,* 193 Md. 292, 296, 66 A.2d 924, 925 (1949)); *accord Miller v. Wells Fargo Bank International Corp.,* 540 F.2d 548, 560 (2d Cir.1976) ("Money deposited in a general account at a bank does not remain the property of the depositor. Upon deposit of funds at a bank, the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it, a mere chose in action").

Under the MIBL Pledge, MIBL pledged the MIBL Accounts to BNY as "security" for "[a]ll of [its] present and future obligations and liabilities of whatever nature (whether matured or unmatured, absolute or contingent)". MIBL also agreed to reimburse BNY "for all costs and expenses, including attorneys' fees and disbursements, incurred by [BNY] in obtaining performance of or otherwise enforcing any of the Obligations or protecting, preserving or enforcing [BNY's] rights with respect to the Collateral." *Id.* at ¶ 3d. Thus, as of the commencement of this § 304 case, BNY, as the depository bank

housing the MIBL Accounts, was indebted to MIBL, MIBL was indebted to BNY for obligations arising under its loan agreement, and it secured those obligations by a pledge of any right that MIBL had to receive funds from the MIBL Accounts pursuant to BNY's obligation to repay them. Thus, the property of MIBL's estate consists of its right to payment from BNY.[4]

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Brand v. Brand,* 811 F.2d 74, 77 (2d Cir.1987) (citations and internal quotation marks omitted). The constructive trust doctrine is equitable in nature and should not be "rigidly limited." *Koreag,* 961 F.2d at 352 (citing *Simonds v. Simonds,* 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978)). If we were to conclude that the MIBL Funds should be held in constructive trust for either the benefit of BNY or DIB, those funds would not be proceeds of property of MIBL's estate subject to turnover. *Id.*

According to BNY, we should impose a constructive trust on the MIBL Funds because MIBL will have been unjustly enriched should it be finally determined that the Tanzania Pledge is invalid. DIB contends that MIBL was unjustly enriched by Meridien Tanzania's pledge because it gave no consideration for that pledge. BNY maintains that we cannot grant movants relief under § 304 until the constructive trust theories are litigated at trial.

Under New York law, the elements of a constructive trust are: (i) a confidential or fiduciary relationship; (ii) a promise, express or implied; (iii) a transfer made in reliance on that promise; and (iv) unjust enrichment. *Koreag,* 961 F.2d at 352 (citing *Bankers Security Life Ins. Society v. Shakerdge,* 49 N.Y.2d 939, 940, 428 N.Y.S.2d 623, 406 N.E.2d 440 (N.Y.1980)); *Simonds,* 45 N.Y.2d at 241–42, 408 N.Y.S.2d 359, 380 N.E.2d 189;

---

4. We refer hereinafter to that right to payment as the "MIBL Funds".

*Sharp v. Kosmalski,* 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721 (N.Y.1976). Movants are correct that based upon the undisputed facts, and as a matter of law, neither BNY nor DIB has demonstrated that the constructive trust doctrine is applicable herein.

BNY does not have a confidential or fiduciary relationship with MIBL. Rather, MIBL is its creditor. *Koreag,* 961 F.2d at 352 ("[p]urely commercial transactions do not give rise to a fiduciary relationship") (citing *Rodgers v. Roulette Records, Inc.,* 677 F.Supp. 731, 738–39 (S.D.N.Y.1988); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 33 A.D.2d 766, 766, 306 N.Y.S.2d 599 (N.Y.A.D.1969), *aff'd,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (N.Y. 1972), *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)). While we recognize that this defect may not be fatal to BNY's position, *see id.* at 353 (the absence of any one of the above-referenced factors is not necessarily fatal to a motion seeking imposition of a constructive trust) (citing *Simonds,* 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189; *Latham v. Father Divine,* 299 N.Y. 22, 27, 85 N.E.2d 168 (N.Y.1949)),[5] there are other problems with BNY's argument. BNY is not seeking to impress a constructive trust on funds that it transferred to MIBL. Rather, MIBL transferred the MIBL Funds to BNY when it funded the MIBL Accounts. Moreover, the only possible promise from MIBL to BNY is embodied in the MIBL Pledge. BNY is seeking to enforce its alleged rights under that pledge to apply the MIBL Funds against its partially liquidated claim against MIBL. It cannot seek to impress a constructive trust on those funds pending a judicial determination as to whether its rights should be enforced. *See Cohen v. Savings Building & Loan Co. (In re Be-*

*vill, Bresler & Schulman Asset Management Corp.),* 896 F.2d 54, 58 (3d Cir.1990) ("[t]he proper remedy for breach of contract, however, is an award of damages at law, not the equitable remedy of constructive trust"); *see also City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48 (2d Cir.1988) (dismissing unjust enrichment claim where written contract existed between parties and court determined that defendant had not breached its obligations thereunder); *Best Western International, Inc. v. CSI International Corp.,* No. 94 Civ. 0360, 1994 WL 465905, *7 (S.D.N.Y. Aug. 23, 1994) (" 'the existence of an express contract between the [parties] governing the particular subject matter of [plaintiff's] claim for unjust enrichment precludes the plaintiff from maintaining a cause of action [for unjust enrichment]' ") (quoting *Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 A.D.2d 758, 583 N.Y.S.2d 497 (N.Y.A.D.1992)); *Camrex Contractors (Marine) Limited v. Reliance Marine Applicators, Inc.,* 579 F.Supp. 1420, 1425 n. 7 (E.D.N.Y.1984) ("Since a contract has been found to exist and recovery will be pursuant to its terms, a discussion of unjust enrichment recovery premised on the absence of a contract would be pointless"). Finally, MIBL has not been unjustly enriched. While MIBL may not have repaid its indebtedness to BNY, that failure to pay is not grounds for imposing a constructive trust on the MIBL Funds. *In re Tri–Way Security and Escort Service, Inc.,* 114 B.R. 24, 27 (Bankr.E.D.N.Y.1990) ("To impress a constructive trust, there must be greater wrongdoing than the mere non-payment of a debt") (citations omitted). Thus, the key factor for imposing a constructive trust is missing as to BNY. *See Koreag,* 961 F.2d at 354 ("the purpose of constructive trust is prevention of unjust enrichment") (citations omitted).

---

**5.** A person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship. *See id.* at 353–54 (citing *Simonds,* 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189; *Latham,* 299 N.Y. at 27, 85 N.E.2d 168; *Cavallaro v. Lewis,* 198 Misc. 412, 98 N.Y.S.2d 730, 731 (N.Y.Sup.Ct. 1950)); *see, e.g., E.W. Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 743 F.Supp. 176, 179–80 (S.D.N.Y.1990) (constructive trust imposed applying New York law despite absence of fiduciary relationship); *SEC v. Levine,* 689 F.Supp. 317,

321–23 (S.D.N.Y.1988) (same), *modified on other grounds,* 881 F.2d 1165 (2d Cir.1989); *see also Republic of Philippines v. Marcos,* 806 F.2d 344, 355 (2d Cir.1986) ("constructive trust is simply a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship") (citation omitted), *cert. dismissed sub nom. Ancor Holdings, N.V. v. Republic of Philippines,* 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784, *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).

■ While MIBL enjoys a commercial relationship with Meridien Tanzania, it holds 74% of the stock of Meridien BIAO S.A., which in turn owns 100% of Meridien Tanzania's stock. Thus, to the extent that MIBL controls a fiduciary of Meridien Tanzania, it too may be deemed a fiduciary of Meridien Tanzania. *See U.S. West, Inc. v. Time Warner Inc.*, Civ. A. No. 14555, 1996 WL 307445, *20 (Del.Ch. June 6, 1996) ("the equitable obligation imposed upon fiduciaries in circumstances of trust and dependency extends in these circumstances to Time Warner as the entity that controls TWE, even though it does so through the intermediation of several wholly owned subsidiaries that serve as the general partners of that enterprise"); *In re USACafes, L.P. Litigation*, 600 A.2d 43, 48 (Del.Ch.1991) (directors of corporate general partner can be held liable for breach of fiduciary obligations to partnership or its limited partners), *appeal denied*, 602 A.2d 1082 (Del. Supr.1991); *Remenchik v. Whittington*, 757 S.W.2d 836 (Tex.App.1988) (general partner's sole shareholder was personally liable to limited partners in that he had breached his fiduciary duty to them).[6] However, MIBL made no promise to Meridien Tanzania and there was no transfer as to Meridien Tanzania. The MIBL Funds are wholly unrelated to the transaction that gave rise to Meridien Tanzania's allegations that MIBL caused it to incur an obligation without any consideration. Meridien Tanzania does not even allege that it had any prior interest in those funds, but merely seeks to impose a constructive trust on them as a collection remedy tantamount to a pre-judgment attachment. As such, its constructive trust claim, and the remainder of BNY's claim as assignee, must fail as a matter of law. *See Gargano v. V.C. & J. Constr. Corp.*, 148 A.D.2d 417, 418, 538 N.Y.S.2d 955 (N.Y.A.D.1989) ("even assuming [the existence of] a promise, the record fails to indicate that either Carmine or VC & J had any prior interest in the premises which was conveyed to Gaetano in reliance upon a promise to reconvey. Although a constructive trust may be imposed where property is parted with in reliance upon a promise to reconvey, 'none may be imposed by one who has no interest in the property prior to obtaining a promise that such an interest will be given to him' ") (quoting *Marine Midland Trust Co. of Rochester v. Wells (In re Wells Will)*, 36 A.D.2d 471, 474, 321 N.Y.S.2d 200 (N.Y.A.D.1971), *aff'd*, 29 N.Y.2d 931, 329 N.Y.S.2d 322, 280 N.E.2d 95 (N.Y.1972), and citing *Scivoletti v. Marsala*, 97 A.D.2d 401, 467 N.Y.S.2d 228 (N.Y.A.D.1983), *aff'd*, 61 N.Y.2d 806, 473 N.Y.S.2d 949, 462 N.E.2d 126 (N.Y.1984); *Onorato v. Lupoli*, 135 A.D.2d 693, 522 N.Y.S.2d 593 (N.Y.A.D.1987)); *Schwab v. Denton*, 141 A.D.2d 714, 715, 529 N.Y.S.2d 825 (N.Y.A.D.1988) ("[t]he amended complaint fails to disclose a confidential relationship between the parties or any promise on the part of the defendants or anyone connected with the parcel"), *appeal denied*, 73 N.Y.2d 701, 536 N.Y.S.2d 60, 532 N.E.2d 1288 (N.Y.1988). Based upon the foregoing, we find that the MIBL Accounts are not excluded from MIBL's estate by reason of any constructive trust theory.

Relying on *Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.)*, 98 B.R. 243 (Bankr.E.D.Va.1989), BNY argues that the MIBL Accounts are not part of MIBL's estate.[7] In that case, the debtor had entered into a mobile home dealer agreement which permitted it to sell its chattel paper—conditional sales contracts created upon the sale of mobile homes—to the defendant bank on a full recourse basis, at a discount from face value less a portion which was set aside for loss reserves in an account at the bank. At all times, the account was under the bank's sole custody and control. The debtor was not permitted to withdraw any of the funds from the account, and the bank claimed it had a perfected lien on the account as security for all obligations it might incur based upon

---

6. MIBL denies that there was a confidential or fiduciary relationship between MIBL and Meridien Tanzania, but fails to cite any support for its assertion.

7. It also argued that MIBL has no right to compel the turnover of the MIBL Accounts until the claims and contingencies which may impact on BNY's rights to those accounts are resolved. Given the Tanzania Settlement, and at least the partial liquidation of BNY's claim, we need not address that argument.

potential claims which might arise as a result of mobile home purchasers' non-payment of indebtedness evidenced by the chattel paper sold by the debtor. *Id.* at 245. After the debtor filed for bankruptcy, its trustee moved for an order directing the bank to turn over the accounts. The court denied the motion, stating, in relevant part, as follows:

> Although the ... bankruptcy estate does possess an interest in the [account], and that it is estate property, at the present time the trustee is not entitled to turnover of any funds in the [account] ... because the estate's interest is limited to the potential that upon final liquidation of all chattel paper sold by [the debtor to the bank], under which there are presently outstanding obligations of nearly one million dollars, [the bank] will not be required to use the funds in the [account] to offset losses arising from nonpayment of the paper. For this reason, the Court cannot order [the bank] to turn over those funds, if any, contained in the [account] in which the trustee has an interest until such time as all of the outstanding debts evidenced by the chattel paper are liquidated and [the bank's] losses are determined.

*Id.* at 246 (footnote omitted). The *A & B Homes* court did not find that the debtor's interest in the account was not part of its bankruptcy estate. Rather, it found that "although the estate of the debtor does have a property interest in the funds in the Reserve Account, this interest is contingent in nature and is not, at the present, subject to turnover." *Id.* at 245. Based upon the court's subsequent discussion of setoff under § 553, *see, id.* at 248, its observation that turnover might be warranted once those liabilities were liquidated, *id.* at 246, n. 3, and its determination not to address the propriety of turnover upon provision of adequate protection because the issue was never raised and none was never proffered, *id.*, we read *A & B Homes* to stand for the proposition that

a bank with a perfected security interest in an account and possessing a right of setoff cannot be compelled to surrender its collateral in a turnover proceeding under § 542, but that the debtor's interest in the account is nevertheless property of its estate. This principle is entirely consistent with the Bankruptcy Code and caselaw construing it. *See* 11 U.S.C. § 553;[8] *Smith v. Mark Twain National Bank,* 805 F.2d 278 (8th Cir.1986); *Kenney's Franchise Corp. v. Central Fidelity Bank N.A., Lynchburg,* 22 B.R. 747 (W.D.Va. 1982); *Stair v. Hamilton Bank of Morristown (In re Morristown Lincoln–Mercury, Inc.),* 42 B.R. 413 (Bankr.E.D.Tenn.1984); *see also* 5 COLLIER ON BANKRUPTCY ¶ 542.04 at p. 542–16 (15th ed. rev.1998). To the extent that *A & B Homes* can be read otherwise, we are not persuaded by its reasoning and are not bound to follow it. *See First Tennessee Bank National Assoc. v. Resolution Trust Corp. (In re Creekstone Apartments Associates, L.P.),* 165 B.R. 851, 854 (Bankr.M.D.Tenn.1994) (pledged bank account becomes property of debtor's estate upon bankruptcy filing); *Broadnax v. Prudential–Bache Securities, Inc. (In re Zimmerman),* 69 B.R. 436, 439 (Bankr.E.D.Wis. 1987) (same); *see also Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (In re USA Diversified Products, Inc.),* 100 F.3d 53, 55 (7th Cir.1996) (bank account became property of debtor's estate upon filing). In any event, §§ 542 and 553 of the Bankruptcy Code are not applicable in an ancillary case. *See Koreag,* 961 F.2d at 357 ("a § 304 proceeding is not a bankruptcy case that implicates the full range of procedural and substantive provisions applicable to domestic bankruptcies") (citing *In re Axona International Credit & Commerce Ltd.,* 88 B.R. 597, 606 (Bankr.S.D.N.Y.1988), *aff'd,* 115 B.R. 442 (S.D.N.Y.1990); *In re A. Tarricone, Inc.,* 80 B.R. 21, 23 (Bankr.S.D.N.Y. 1987); *Metzeler v. Bouchard Transportation Co. (In re Metzeler),* 78 B.R. 674, 677 (Bankr. S.D.N.Y.1987); *Universal Casualty & Sur.*

**8.** That section provides in relevant part as follows:

> Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall

pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b).

*Co., Ltd. v. Gee (In re Gee)*, 53 B.R. 891, 896 (Bankr.S.D.N.Y.1985); 2 COLLIER ON BANKRUPTCY ¶ 304.01, at p. 304–3).[9]

■ BNY and JCPL contend that, even assuming, *arguendo*, that the funds are property of MIBL's estate, we must deny the motion because, at a minimum, by virtue of the MIBL Pledge, BNY is a secured creditor of MIBL with a security interest in the MIBL Accounts, and (i) cannot be compelled as a matter of law to turn over its collateral to a foreign liquidator, (ii) the MIBL Accounts are not needed for MIBL's rehabilitation and MIBL has not adequately protected its interest in them, and (iii) the doctrine of recoupment and BNY's statutory, common law and contractual rights of setoff bar the requested relief. As noted, MIBL denies that BNY is a secured creditor, but we will assume that it is for purposes of this discussion.

BNY cites *Flournoy v. City Finance of Columbus, Inc.*, 679 F.2d 821 (11th Cir.1982), for the proposition that a secured creditor in possession of property is not subject to a turnover order. However, the sole issue in *Flournoy* was "whether a secured creditor who repossesses a debtor's automobile without legal process, as permitted by Georgia Code § 109A–9–503 (Rev.1979), is a custodian within the meaning of the Bankruptcy Act of 1978, 11 U.S.C. § 101(10)(C), so as to require delivery of possession to the trustee in bankruptcy in accordance with 11 U.S.C. § 543(b)." *Id.* at 822. The case did not involve a turnover request pursuant to either § 542 or § 304(b) of the Bankruptcy Code. Moreover, to the extent that it could be interpreted to preclude turnover of property in the possession of a secured creditor, we decline to follow it as being contrary to the rule of law articulated by the Supreme Court in *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 211, 103 S.Ct. 2309, 2317, 76 L.Ed.2d 515 (1983). We disagree that either *Koreag* or *In re Toga Manufacturing Ltd.*, 28 B.R. 165

(Bankr.E.D.Mich.1983), compels a contrary conclusion in the context of this § 304 case. BNY claims that our court of appeals in *Koreag* stated that "turnover would be 'unfair or otherwise improper' if the creditor had 'a valid security interest' ". In fact, the full excerpt from its opinion provides as follows:

> Under any view of the relative weight to be accorded the pertinent § 304(c) factors, turnover would be a permissible exercise of discretion as to those funds. In the only possible turnover scenario, the funds subjected to turnover would be subject only to Refco's claim as a general, unsecured creditor. Refco could assert no valid security interest or other benefit of domestic law whose deprivation might render a turnover unfair or otherwise improper. *Cf. Interpool, Ltd. v. Certain Freights of the M/V Venture Star*, 102 B.R. 373, 378–80 (D.N.J. 1988) (denying § 304 petition because American creditor denied procedural protections and remedy of equitable subordination under Australian law), *appeal dismissed*, 878 F.2d 111 (3d Cir.1989); *In re Toga Mfg. Ltd.*, 28 B.R. 165, 168–71 (Bankr.E.D.Mich.1983) (denying § 304 petition because domestic creditor would lose priority status in Canadian proceeding). As the bankruptcy court stated, "Refco does not dispute that Switzerland's insolvency procedures are fundamentally fair." *Koreag*, 130 B.R. at 715. Accordingly, Refco will not be prejudiced if required to litigate unsecured claims in a Swiss proceeding. Comity calls for such a result, and Refco's prior attachment of the Disputed Funds does not suffice to defeat a turnover order under § 304(c). *See Cunard*, 773 F.2d at 458.

961 F.2d at 359. The court clearly states that the "deprivation" of a security interest "might" render a turnover unfair or otherwise improper. Here, however, no one is suggesting that BNY, to the extent that it is

---

9. MIBL also misplaces its reliance on *Hassett v. Blue Cross and Blue Shield of Greater New York (In re O.P.M. Leasing Services, Inc.)*, 46 B.R. 661, 668–69 (Bankr.S.D.N.Y.1985), which involved an escrow rather than a pledged bank account. According to BNY's view of the legal effect of a typical pledge agreement containing the restrictive language set forth in the MIBL Pledge, the debtor's interest in a pledged bank account could never become property of its estate. This is simply not the law, *see Creekstone*, 165 B.R. at 854; *Zimmerman*, 69 B.R. at 439, and BNY cites no authority to suggest otherwise.

2**292**

deemed to be a secured creditor, will be deprived of the benefit of its security interest. As noted, DIB filed a claim in the Bahamas and, pursuant to the Tanzania Settlement, BNY has been assigned DIB's rights in that claim. Bahamian law recognizes security interests in property and BNY does not contend otherwise. *See* Winding–Up Rules § 52 ("An affidavit proving a debt shall state whether or not the creditor is or is not a secured creditor").

BNY also misplaces its reliance on *Toga Manufacturing.* The court in that case found that because a judgment lien creditor in the United States would most likely be treated only as an unsecured creditor under Canadian law, "the distribution of the proceeds of [the debtor's] estate under Canadian law, from [the creditor's] perspective, would not be 'substantially in accordance with the order prescribed by [title 11]' pursuant to Section 304(c)(4)." 28 B.R. at 169. Based upon this finding, it denied the Canadian trustee's motion for an order enjoining state court litigation and directing turnover of funds levied upon by the creditor. *Id.* at 170. As previously noted, BNY does not argue that its security interest in the MIBL Accounts will not be honored under Bahamian law. Moreover, *Toga Manufacturing's* view of comity has been criticized as being overly restrictive:

> The limited focus in *Toga* on the minor substantive differences between Canadian and U.S. law prevented the Court from considering the full scope and procedural fairness of Canadian law. This case is simply an example of "[t]he court's paramount concern with the protection of the rights of U.S. creditors...." Note at 566. The result of the *Toga* decision was that the U.S. creditor was entitled to a disproportionate piece of the estate, to the detriment of all other creditors. This decision is out of line with the modern need for flexibility in the construction of comity.

*Axona,* 88 B.R. at 611.

■ Section 304 does not condition turnover upon the provision of "adequate protection" to the holder of any interest in the foreign debtor's property. That condition applies only to turnover proceedings under

§ 542 of the Bankruptcy Code or requests to use, sell or lease property subject to a security interest pursuant to § 363 of the Bankruptcy Code. Those provisions are inapplicable in ancillary cases. BNY's attempt to engraft additional substantive requirements onto § 304 is wholly unsupported, and we reject it. The protection afforded to BNY by the statute is the ability to pursue its claims in a foreign proceeding that we have deemed to satisfy the requirements of § 304(c), not "adequate protection" of its property interest.

■ Likewise, we reject BNY's argument that property can only be turned over to a foreign representative if it is necessary to facilitate the rehabilitation of the debtor's business. Like adequate protection, "rehabilitation" is not a requirement under § 304. Many § 304 cases involve foreign debtors undergoing liquidation proceedings. *See, e.g., Koreag,* 961 F.2d at 345 (debtor subject to Swiss liquidation proceeding); *Rubin,* 160 B.R. at 272 (debtor subject to Israeli liquidation proceeding); *Axona,* 88 B.R. at 600 (debtor ordered wound-up under Hong Kong law). BNY's reading of § 304 would improperly preclude granting relief in those cases.

Citing *In re Culmer,* 25 B.R. 621 (Bankr. S.D.N.Y.1982), BNY argues that we cannot direct it to turnover the MIBL Funds because it asserts a right of setoff against those funds. However, in *Culmer,* the court did not deny a request for a turnover of funds based upon a depository bank's claimed right of setoff. Rather, the foreign representative conceded that the bank could continue to hold certain funds in the U.S. which were subject to the bank's alleged right of setoff and the court extended that concession to another bank. *Id.* at 634 n. 6.

■ Recoupment is the recovery of money owed arising from the same transaction as the plaintiff's claim or cause of action, solely for the purpose of abatement or reduction of that claim. *See Malinowski v. New York State Department of Labor (In re Malinowski),* 156 F.3d 131, 133 (2d Cir.1998). " 'The distinction between a recoupment and a setoff is that a recoupment, unlike a setoff, does not involve the concept of mutuality of

obligations and arises out of a single transaction between the creditor and the debtor.'" *Schachter v. Tolassi (In re 105 East Second Street Associates)*, 207 B.R. 64, 68 (Bankr. S.D.N.Y.1997) (citing *Lee v. Schweiker*, 739 F.2d 870 (3d Cir.1984)); *Sapir v. Blue Cross/ Blue Shield of Greater New York (In re Yonkers Hamilton Sanitarium, Inc.)*, 34 B.R. 385, 386 (S.D.N.Y.1983); 5 COLLIER ON BANKRUPTCY ¶ 553.03 (15th ed. rev.1996). Funds subject to recoupment are not the debtor's property. *See Malinowski*, 156 F.3d at 133 (citations omitted). Thus, BNY and JCPL contend that the MIBL Funds are not property in MIBL's estate.

■■■■ MIBL denies that the competing claims arise out of the same transaction. Citing *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 156–57 (10th Cir.1986), BNY argues that we must interpret the single transaction rule broadly so that a group or series of separate agreements can constitute the requisite single transaction to establish recoupment. BNY explains that MIBL's claim is that it is entitled to a turnover of the MIBL Funds simply based on its account relationship with MIBL. BNY contends that the MIBL Pledge is part of that relationship. Therefore, for BNY, the account relationship and MIBL Pledge constitute the same transaction for the purposes of recoupment and the MIBL Funds should be turned over. However, in this circuit it is clear that we give the term "transaction" a restricted definition. "In light of the Bankruptcy Code's strong policy favoring equal treatment of creditors and bankruptcy court's supervision of even secured creditors, the recoupment doctrine is a limited one and should be narrowly construed." *In re Malinowski*, 156 F.3d at 133 (quoting *New York State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 97 (2d Cir.1997)). A mere logical relationship is not sufficient to warrant recoupment in the bankruptcy court. *Id.* (quoting *University Med. Ctr. v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3rd Cir.1992)). Thus, "both debts [must] arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefit of the transaction without also meeting its obligations." *Id.* MIBL is

seeking to recover the MIBL Funds by virtue of its bank/customer relationship with BNY. BNY seeks the MIBL Funds because it cannot fully enforce Meridien Tanzania's guarantee of BNY's loans to MIBL. The debts do not arise out of a single integrated transaction.

Moreover, confronted with similar facts, other courts have concluded that a bank's claim against funds on deposit is more properly characterized as one for setoff than recoupment. *See Shugrue v. Chemical Bank, Inc. (In re Ionosphere Clubs, Inc.)*, 177 B.R. 198, 206 (Bankr.S.D.N.Y.1995) (where bank attempts to collect chargebacks from deposit account post-petition, claim is one for setoff rather than recoupment); *In re Village Craftsman, Inc.*, 160 B.R. 740, 747 (Bankr. D.N.J.1993) ("A debtor in possession can compel turnover of [a security] deposit under Code section 542(a). The view that postpetition application of a security deposit is recoupment rather than setoff undermines the purposes of Code sections 363(a) and (c)"); *Moratzka v. Visa USA (In re Calstar, Inc.)*, 159 B.R. 247 (Bankr.D.Minn.1993) (recovery of chargebacks from post-petition deposit is a violation of section 549 and the automatic stay); *Sherman v. First City Bank (In re United Sciences of Am., Inc.)*, 84 B.R. 79, 82 (Bankr.N.D.Tex.1988) ("To allow parties who dealt with a debtor-in-possession, pre-petition, to continue subjectively crediting or offsetting these credit card settlements post-petition would defeat the definition of property of the estate and the policy of the automatic stay"), *aff'd*, 99 B.R. 333 (N.D.Tex. 1989), *aff'd*, 893 F.2d 720 (5th Cir.1990).

■■■ Finally, BNY and JCPL argue that we must deny the motion because the movants have failed to meet their burden under § 304(c) of the Bankruptcy Code. As noted, MIBL's liquidation proceeding is being conducted pursuant to the Companies Act and Winding–Up Rules and under the auspices of the Supreme Court of the Commonwealth of the Bahamas. The Winding–Up Order directed that movants be appointed Official Liquidators of MIBL. Thus, MIBL's liquidation proceeding is a "foreign proceeding" and movants are "foreign representatives",

under 11 U.S.C. §§ 101(23) and 101(24), respectively.[10]

In *Culmer*, my colleague Judge Burton R. Lifland concluded that liquidation proceedings under the Companies Act meet the requirements of § 304(c). 25 B.R. at 629–32; *see also In re Petition of Thomas Hackett*, 184 B.R. 656, 658 (Bankr.S.D.N.Y.1995) (Lifland, J.) (Bahamian liquidation procedures satisfy § 304(c)) (citing *Culmer*); *In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 726 (Bankr.S.D.Fla.1993) (same). Nonetheless, BNY contends that movants cannot establish that § 304(c) is satisfied in this case. While BNY does not contend that those cases are wrongly decided, it argues that we should not follow them because it has raised issues herein that were not considered in those cases and which preclude relief under § 304.

Both BNY and movants submitted expert testimony regarding substantive and procedural aspects of Bahamian law. Movants submitted declarations of Brian M. Moree, while BNY submitted affirmations of Dr. Peter D. Maynard.[11] Both Mr. Moree and Dr. Maynard are distinguished members of the Bahamas Bar Association and both are qualified to give expert testimony regarding Bahamian law. As relevant, while Mr. Moree's affidavits addressed a wide range of aspects of the Companies Act and Winding–Up Rules, Dr. Maynard focused on whether the doctrine of equitable subordination exists under Bahamian law. Thus, the bulk of Mr. Moree's submissions are uncontested. We considered the testimony of both experts and reviewed Bahamian law in determining whether movants have met their burden under § 304(c).

*Culmer* involved the 1982 voluntary liquidation of a banking company under § 129 of the Companies Act. 25 B.R. at 623. MIBL is the subject of an involuntary liquidation proceeding under §§ 192–275 of the Bahamian Companies Act of 1992. Nonetheless, in substance, the operative provisions of the Companies Act that we consider herein mirror those that Judge Lifland analyzed in *Culmer*. Like Judge Lifland, and as explained below, we find that although Bahamian law is not identical in application to American law, "there is nothing inherently vicious, wicked, immoral or shocking to the prevailing American moral sense ... [and] Bahamian laws are not repugnant to our ideas of justice." *Id.* at 631.

BNY first asserts that forcing it to turn over the MIBL Funds for distribution among all of MIBL's creditors deprives it of its alleged right to receive adequate protection, in violation of § 304(c)(1), (c)(2) and (c)(4). However, we have already determined that there is no requirement under § 304 that BNY's interests in the MIBL Funds be adequately protected. Moreover, we find that § 304(c)(1) is satisfied because the Companies Act provides for a comprehensive procedure for the orderly and equitable distribution of MIBL's assets among all of its creditors. We reach that conclusion because:

- MIBL's liquidation is being conducted pursuant to the Companies Act and Winding–Up Rules and under the auspices of the Supreme Court of the Commonwealth of the Bahamas.

- Movants, as Bahamian liquidators, are subject to the control and supervision of the Bahamian court. Moree Decl. ¶ 15. They must report to court and creditors on a semi-annual basis and must account to all creditors for their stewardship. *Id.* (citing Winding–Up Rules 3, 86–90).

---

10. Section 101(23) defines "foreign proceeding" as

> [a] proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization[.]

11 U.S.C. § 101(23). A "foreign representative" means a "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding". 11 U.S.C. § 101(24).

11. Mr. Moree submitted a March 17, 1997 declaration (the "Moree Decl."), an August 8, 1997 supplemental declaration, and an August 20, 1998 supplemental declaration (the "Moree Supp. Decl."). Dr. Maynard submitted a July 10, 1997 affirmation (the "Maynard Aff.") and an August 29.1997 rebuttal affirmation.

- Upon the request of creditors, the court can direct meetings of creditors to take place and appoint persons to chair those meetings and to report the results to the court. *Id.* ¶ 37. In its discretion, and for cause shown, the court can remove any liquidator appointed by the company or refuse to appoint a liquidator nominated by a minority of creditors if the majority opposes it. *Id.*

- The court must approve all compromises, *id.* ¶ 16 (citing Companies Act 268), and movants cannot pay out any money or make any distributions to creditors without prior approval or sanction of the court, on notice to all interested parties. *Id.* (citing Winding–Up Rules 32 and 33).

- The commencement of a winding up proceeding prevents a party from continuing or commencing a court action against the company without leave of the court. *Id.* ¶ 18.

- After the commencement of the winding up proceedings and before the order for winding up, all "dispositions of property, effects and things in action of the company and every transfer of shares or alteration in the status of the shareholders" are void. *Id.* ¶ 19 (citing Companies Act § 260).

- Pursuant to § 272 of the Companies Act, any undue or fraudulent preference of one creditor over another is invalid. *Id.* ¶¶ 20 and 21.

- The Companies Act, as supplemented by Bahamian criminal law, vests the liquidators with broad power to investigate the actions of the companies' directors, managers, officers and officials and the court can sanction them for breaches of trust or other misfeasance. *Id.* ¶¶ 22–26.

- Domestic creditors are not preferred over foreign creditors. *Id.* ¶ 27.

BNY next contends that the Bahamian liquidation proceeding is fundamentally unfair and thereby violates § 304(c)(2) (protection of U.S. claimholders against prejudice and inconvenience in the processing of claims in the foreign proceeding) because creditors in a Bahamian liquidation proceeding cannot object to claims filed by other creditors. As support, BNY cites to the deposition testimony of David Hamilton, an accountant employed by KPMG Bahamas. However, Mr. Hamilton did not state that creditors cannot object to claims of other creditors. He merely stated that he did not believe that they could. *See* Transcript of May 13, 1998 Deposition of David Patrick Hamilton 49:18–20. In the Supp. Moree Decl., Mr. Moree unequivocally states that Bahamian law provides creditors with the ability to object to the claims of other creditors either directly to the court or derivatively in the name of the liquidating corporation. *See* Supp. Moree Decl. ¶ 11. BNY does not challenge that testimony. Thus, we do not credit BNY's objection.

Moreover, Bahamian law otherwise complies with § 304(c)(2) because the Companies Act protects U.S. claimholders from prejudice and inconvenience in the processing of their claims. We come to this conclusion because, under Bahamian law:

- There is no absolute Time limit within which creditors must file claims, Moree Decl. ¶ 29; however, the liquidator may from time to time establish deadlines for filing proofs of claim. *Id.* Creditors must be given at least 28 days notice of the bar date by advertisement and by written notice mailed to each person who has not filed a proof of claim but is believed to be a creditor. *Id.* (citing Winding–Up Rule 60). Where the company in liquidation is engaged in international business, the Supreme Court usually will direct the liquidators to advertise for claims in all countries, including the U.S., where creditors are known or believed to be located. *Id.* ¶ 30 (citing Winding–Up Rule 19).

- If the liquidator rejects a claim, the creditor has an opportunity to be heard. *Id.* ¶ 30 (citing Winding–Up Rules 61–65). Creditors can file their claims by mail, and can prove them by affidavit (which may be submitted by mail), unless the court directs that the creditor or any class of creditors may have his, its or their claims admitted without proof. *Id.* (citing Winding–Up Rules 50–59). It is only if a creditor objects to the liquidator's rejection of its claim and appeals

to the Court that the creditor would have to file an additional affidavit in support of its claim. *Id.* As a matter of practice, the claimant will not be cross-examined. However, in the case of a U.S. creditor, that examination can be taken in the U.S. *Id.*

- The liquidator must notify each claimant whose claim is being rejected and must provide a written statement of the grounds for the rejection. *Id.* ¶ 32 (citing Winding–Up Rule 61). A creditor whose claim is rejected can appeal to the Supreme Court which will give it *de novo* review. *Id.* (citing Winding–Up Rule 62). A claimant has 28 days within which to appeal the liquidator's rejection of its claim. *Id.* ¶ 33 (citing Winding–Up Rule 62). If the claimant files a notice of appeal, the liquidator has three days after receipt of the appeal in which to file the rejected proof of claim with the court, together with a memorandum stating the reasons for the rejection. *Id.* (citing Winding–Up Rule 66). The parties would then conduct a full hearing on the validity of the claim in the Supreme Court. *Id.* ¶ 34. They have a right to appeal adverse decisions. *Id.*

BNY does not contend that the Bahamian liquidation proceeding violates § 304(c)(3) (prevention of preferential or fraudulent dispositions of property of such estate). The Companies Act prevents preferential transfers. For example, pursuant to § 272 of the Companies Act, any undue or fraudulent preference of one creditor over another is invalid. Moree Decl. ¶¶ 20 and 21.

Under § 304(c)(4) we consider whether under Bahamian law, the distribution of proceeds from MIBL's estate is substantially in accordance with the order prescribed under the Bankruptcy Code. It is undisputed that the Official Liquidators must marshal MIBL's assets and, subject to retaining such sums as may be necessary to pay the costs and expenses of the winding up, apply the assets first in payment of certain taxes, specified pre-petition wages and amounts in satisfaction of personal injuries to workmen, *id.* ¶ 17 (citing Companies Act § 267(1)); next to secured creditors and then to general unse-

cured creditors on a *pari passus* basis, and finally to the contributories. *Id.*

Still, BNY argues that the Companies Act violates § 304(c)(4) because Bahamian law does not recognize the equitable subordination of claims. Mr. Moree states that Bahamian law recognizes the concept of subordination of claims, and apparently bases his opinion on the ability afforded under Winding–Up Rules 62 and 64 for a creditor or the court to object to any creditor's claim if it is dissatisfied with the determination of the official liquidator, and the ability of creditors under certain circumstances to bring actions on behalf of the company. *See* Supp. Moree Decl. ¶¶ 6–11. Dr. Maynard disputes that assertion in part on his inability to find any authority indicating that Bahamian law recognized equitable, as opposed to contractual, subordination, and a 1992 decision in which the court stated that "there is no Commonwealth decision on a point which is of practical importance in relation to subordination of debts." Maynard Aff. ¶ 4 (quoting *Chea Theam Swee v. Equiticorp Finance Ltd.,* 1 App.Cas. 472, 476 (P.C.1992)).

Based upon Dr. Maynard's opinion, and the holdings in *Interpool Ltd. v. Certain Freights of the M/V Venture Star,* 102 B.R. 373 (D.N.J.1988), *appeal dismissed* 878 F.2d 111 (3d Cir.1989) and *In re Petition of Mohammed S. Hourani,* 180 B.R. 58 (Bankr. S.D.N.Y.1995), BNY asserts that the absence of the remedy of equitable subordination in the context of MIBL's proceeding precludes any § 304 relief. In both *Interpool* and *Hourani,* the courts denied foreign representatives relief under § 304 and dismissed the petitions because, among other things, the laws of Australia (*Interpool,* 102 B.R. at 379–80) and Jordan (*Hourani,* 180 B.R. at 67) did not recognize the doctrine of equitable subordination. However, neither court acted solely for that reason and thus both cases are distinguishable.

In *In re Hourani,* the liquidation committee (the "Committee") of a Jordanian bank ("Petra Bank") being liquidated pursuant to Jordanian law (the "Jordanian Proceeding"), petitioned the court for an order pursuant to § 304(b) of the Bankruptcy Code directing a U.S. creditor ("A.I.Trade") to turnover cer-

tain funds that it had seized pursuant to an *ex parte* order of attachment and which it had deposited with the clerk of the district court. 180 B.R. at 58. Although the Jordanian Companies Law had provisions governing bank liquidations, the Jordanian government, as permitted by law, enacted special legislation (the "Petra Resolutions") solely for the liquidation of Petra Bank. *Id.* at 61. The Committee managed the liquidation process. It moved for summary judgment deferring to the Jordanian Proceeding and ordering the turnover of all Petra Bank funds to the Committee for administration in accordance with the laws of Jordan. *Id.* at 58. A.I. Trade opposed the Committee's request for relief and cross-moved to dismiss the § 304 petition. *Id.*

In considering the motions, the court stated that pursuant to § 304 of the Bankruptcy Code, it would defer to the Jordanian liquidation proceedings provided it found a "reasonable degree of certainty that the consideration of all parties' rights will be fair and impartial", *id.* at 64, and that Jordanian law was "not be repugnant to this nation's general principles of justice, regardless of the form in which those principles are manifested." *Id.* at 65. After conducting an in depth analysis of the Petra Resolutions in light of the relevant provisions of § 304(c), the court denied the Committee's motion and dismissed the proceeding. Part of its rationale in so ruling was that the Petra Resolutions failed to offer U.S. creditors predictable treatment because they were the sole source of authority governing the bank liquidation, except to the extent that the Committee chose to supplement them with established Jordanian Commercial or Civil law and because creditors had no right to resort to those laws. *Id.* at 66. As BNY contends, another reason that the court dismissed the petition was that the Petra Resolutions did not contain provisions for equitable subordination or for prohibiting the sale of certain assets to remedy fraudulent or inequitable conduct. *Id.* at 67. However, that clearly was not the basis for the court's decision to dismiss the case. Rather, in dismissing the case, the court found that "the central problem with the Petra Resolutions ... is that there is no way for an objective party to construe them such that they ensure fair and equal treatment of all creditors." *Id.* at 70. Among the factors that the court considered in reaching that conclusion were that the Petra Resolutions: (i) did not provide for interested parties to object to actions by the Committee, other than those decisions directly related to their interests, and therefore could not protest if the Committee compromised claims or treated claims in a discriminatory manner, (ii) permitted the Committee to deny a claim against the debtor without providing the reason or reasons underlying its denial, (iii) did not guarantee that a creditor who requested information would receive it, and even if a request for information was granted, provided no systematic framework by which information may be obtained, used, or considered in any meaningful way during the proceeding, (iv) failed to contain provisions that provided creditors with sufficient notice, (v) made no provisions for recovery of preferences or fraudulent conveyances, (vi) made no distinction between secured and unsecured creditors, and (vii) gave the Committee such vast discretion that there were insufficient procedural safeguards to ensure just treatment to creditors. *Id.* at 66–70.

In *Interpool*, KKL was an Australian liner company that had assets and creditors in the U.S. and Australia. The U.S. assets consisted of cash on deposit in the registry of the district court and an arbitration proceeding valued at between $3 million and $40 million. 102 B.R. at 373. A creditor ("Wah Kwong") commenced involuntary liquidation proceedings against KKL in Australia in January 1986. *Id.* at 374. Thereafter, the Australian Court directed KKL to wind up its operations and appointed a Liquidator to oversee that process. *Id.* In February 1986, the Liquidator filed a § 304 petition and in April 1986, various U.S. creditors commenced an involuntary case under chapter 7 of the Bankruptcy Code against KKL. *Id.* at 374–375.

During the pendency of the § 304 case, the court authorized the Liquidator to distribute portions of the fund in the registry of the court to various U.S. creditors. *Id.* at 375. In each instance, in exchange for the payment, the distributee waived all claims

against KKL and the Liquidator, but not against Wah Kwong. In May 1986, the Liquidator, Wah Kwong and others entered into an agreement regarding the distribution of the arbitration proceeds. *Id.* Pursuant thereto, the Liquidator agreed to distribute the first $6 million of arbitration proceeds to Wah Kwong in full satisfaction of its claim. *Id.* at 376. That agreement was not submitted to the U.S. court for approval. Rather, in accordance with Australian law, the Liquidator submitted to it to the Australian court *ex parte. Id.* at 376, 378–379.

Certain U.S. creditors moved pursuant to § 305 of the Bankruptcy Code for an order dismissing the § 304 proceeding. *Id.* at 376. The Liquidator opposed that motion and sought an order permitting KKL's ancillary case to proceed. In assessing the motion, the court considered (a) whether U.S. creditors had the ability to pursue their rights in the Australian Court and (b) whether there was enough parity in the Australian Bankruptcy Rules so that U.S. creditors would be similarly protected in both jurisdictions. *Id.* at 377. As BNY correctly contends, the court dismissed the case, in part because the substantive remedy of equitable subordination was not available under Australian law. *Id.* at 378. However, as with *Hourani,* the failure of the foreign proceeding to recognize the doctrine of equitable subordination was not the sole reason for dismissing the petition. Significantly, the court found that the Australian proceedings essentially were *ex parte* proceedings, so that while U.S. creditors could get access to the Australian Court, they did not have the right to petition the court to set aside the Liquidator's agreement with Wah Kwong. *Id.* at 378. The court found that the lack of notice to U.S. creditors of the disposition of assets was a "serious omission" in the Australian law, *id.* at 378, because "[p]rocedural protections provided in the Bankruptcy Code are considered of paramount importance" and under U.S. law, creditors would have been entitled to that notice. *Id.*

■ The procedural and substantive shortcomings in the Jordanian and Australian insolvency proceedings that the courts found significant in *Hourani* and *Interpool,*

respectively, are not present here. For example, MIBL's liquidation proceeding is being conducted pursuant to the Companies Act and the Winding–Up Rules, not special legislation. Movants are court appointed fiduciaries who are bound to apply Bahamian law and cannot, like the Committee in *Hourani,* choose which provision of that law they will apply. Moreover, Bahamian law provides certainty that all parties will be treated in a fair and equitable way and is not repugnant to U.S. general principals of justice. Unlike the Australian proceeding in *Interpool,* the Bahamian proceedings are not *ex parte* proceedings. Furthermore, movants cannot pay out money to creditors or otherwise make distributions without court order, on notice to all interested parties. Even assuming, *arguendo,* that the doctrine of equitable subordination does not apply under Bahamian law, that is no basis for denying this motion. Section 304 does not mandate that the Companies Law mirror the Bankruptcy Code. *See Hourani,* 180 B.R. at 65; *Gee,* 53 B.R. at 904; *In re Petition of Anthony William Brierley,* 145 B.R. 151, 167 (Bankr.S.D.N.Y.1992). Rather, "[t]he key is that the insolvency laws in the foreign proceeding must not be repugnant to this nation's general principles of justice, regardless of how those principles are manifest." *Hourani,* 180 B.R. at 64; *see also Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 998–1000 (2d Cir.1993), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993). The Winding–Up Rules and Companies Act substantially comply with U.S. law, and plainly are in keeping with our general principles of justice. They afford U.S. creditors fundamental due process rights and do not discriminate against U.S. creditors. Moreover, as we have noted, the Companies Act contains provisions for invalidation of fraudulent transfers. We do not read § 304(c)(4) so narrowly as to conclude that the failure of the Bahamian law to recognize the doctrine of equitable subordination precludes granting movants relief herein.

■ Comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to interna-

tional duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Citing *Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir.1997), and *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972), BNY argues that we should not grant comity to the Bahamian liquidation proceeding because Bahamian law does not recognize the doctrines of equitable subordination or adequate protection. As noted, we find no merit to either assertion.

In *Pravin*, Banco Popular del Peru borrowed significant sums from, among other financial institutions, Mellon Bank, N.A. 109 F.3d at 851. In March 1983, Peru announced that it no longer had sufficient reserves to service its foreign debt and entered into an agreement with, among others, Mellon, for a 360 day extension of the due dates on Banco Popular's loans (the "Mellon Agreement"). *Id.* at 852. In 1984, Banco Popular violated the Mellon Agreement when it stopped making principal payments on the Mellon debt. *Id.* In 1989, Mellon, among other lenders, filed claims against Banco Popular to avoid any statute of limitations problems. *Id.* In 1990, a committee of Peru's creditors (the "Bank Advisory Committee") entered into an agreement with various foreign financial institutions to stay the lawsuits while a global settlement was negotiated. *Id.*

Pravin Banker Associates, Ltd. ("Pravin") purchased Mellon's claims against Banco Popular at a discount. *Id.* at 853. Banco Popular began to make interest payments directly to Pravin. *Id.* Pravin alleged that Banco Popular failed to make certain interest payments, and declared a default. *Id.* In 1992, Peru appointed a committee to liquidate and distribute Banco Popular's assets. *Id.* Instead of negotiating with the Peruvian liquidators, Pravin commenced an action to collect on the debt. *Id.* The district court twice stayed the proceedings in order to allow the Peruvian liquidation to be completed. *Id.* However, it denied Banco Popular's third request for a stay, and its motion to dismiss Pravin's lawsuit. *Id.* The district court granted Pravin's summary judgment motion, and Banco Popular appealed. *Id.* at 854.

Banco Popular argued, among other things, that the district court should have extended comity to Peru's negotiations with the Bank Advisory Committee. *Id.* The Second Circuit noted that comity is granted to foreign proceedings where those proceedings do not violate U.S. government policy. *Id.* at 854–855. It noted that the U.S. Brady Plan encouraged participation in foreign debt resolution, but such participation was voluntary and required the debt to remain enforceable throughout negotiations. *Id.* at 855. The court held that the district court was correct in granting summary judgment. First, it found, if the district court denied Pravin's summary judgment motion, that decision would have had the effect of preventing Pravin from (i) enforcing the debt until such time that the Peruvian liquidation proceedings wound up, and the liquidation proceedings had no obvious termination date, and (ii) exercising its legal rights outside the Peruvian liquidation proceeding. *Id.* The court further held that even if Banco Popular argued that a stay of the proceedings would permit the liquidation proceedings to continue and would not threaten the ultimate enforceability of the debt, the district court considered all of the proper facts and did not abuse its discretion in not granting a stay. *Id.*

In *Somportex*, Somportex, Ltd. sued Philadelphia Chewing Gum Corp. ("PCG") for breach of contract in the Queens Bench Division of the High Court of England, and served a writ of summons upon PCG in the United States. 453 F.2d at 437. PCG entered a "conditional appearance" in the English proceeding, and sought to dismiss the writ. *Id.* However, it announced that it was not going to challenge the writ and intended to withdraw its appearance of counsel. *Id.* at 438. The Master denied defendant's challenge to the writ. *Id.* Four days later, PCG sought to withdraw its appearance of counsel. *Id.* The Master granted PCG's motion, but was overturned by the Court of Appeal. *Id.* The Court of Appeal concluded that PCG's appearance was unconditional and that it

submitted to English jurisdiction. *Id.* However, it noted that PCG was entitled to appeal the Master's determination that the writ was valid. *Id.* Notwithstanding the fact that the Master granted PCG additional time to appeal its decision, PCG took no action. *Id.* at 439–440. The Master subsequently granted Somportex a default judgment, which it sought to enforce in the United States. *Id.* at 440. The U.S. district court permitted it to do so and PCG appealed. PCG argued, among other things, that a U.S. court should not grant comity to British law in this instance. *Id.*

The Third Circuit noted that "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Id.* PCG argued that the court should deny comity because the English court did not properly consider the factual and legal basis for its jurisdiction. *Id.* at 441. The court concluded that it was unnecessary to determine whether extraterritorial service was permitted by the English equivalent of the U.S. long arm statute, and that the English court afforded PCG an opportunity to contest the factual basis of England's jurisdiction, and even granted defendant additional time to do so. *Id.* The court held that because defendant decided to forgo that opportunity, it would not be permitted to now choose the forum to contest English jurisdiction. *Id.*

PCG also asserted that the court should not grant comity because the English practice of converting a conditional appearance into an unconditional appearance contravenes U.S. policy. *Id.* at 441–442. Noting that the special appearance to contest jurisdiction no longer exists under U.S. law, *id.* at 442, n. 10, the court found that the English practice in this respect is identical to that under the Federal Rules of Civil Procedure and the Pennsylvania Rules of Civil Procedure. *Id.* at 442. It concluded that comity should be granted because (i) the default judgment was not obtained through fraud or collusion, (ii) the English notification method reasonably provided PCG notice of the proceedings, and (iii) English procedure provided PCG with a reasonable opportunity to be heard. *Id.* at 442–443.

In addition, PCG argued that the court should deny comity because English law, unlike U.S. law, permits damages in breach of contract actions for loss of good will and costs, including attorneys' fees. *Id.* at 443. The court held that the fact that Pennsylvania law did not permit recovery for these damages in breach of contract actions was an insufficient basis to deny comity, stating that enforcement of English remedies for breach of contract actions would not " 'tend[ ] clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel, is against public policy.' " *Id.* (quoting *Goodyear v. Brown*, 155 Pa. 514, 518, 26 A. 665 (Pa.1893)).

Lastly, PCG argued that it had insufficient contacts with England, and that being dragged into an English Court of law would violate American due process. *Id.* The Court disagreed, ruling that PCG's utilization a New York exporter to sell its goods in England provided the necessary contacts to subject it to English jurisdiction, and was consistent with American due process. *Id.* at 444.

Both cases are distinguishable. First, neither *Pravin* nor *Somportex* dealt with issues even remotely related to equitable subordination or adequate protection. *Pravin* concerned a stay of U.S. debt enforcement proceedings in favor of a Peruvian liquidation, and *Somportex* concerned an English default judgment, wherein the defendant was liable for breach of contract. Second, neither case dealt with whether U.S. courts should grant comity to Bahamian law.

■ We reject BNY's restrictive view of comity and find that the liquidation laws of the Bahamas are imbued with the fundamental fairness necessary for us to grant the relief requested by movants. Having concluded that the factors set forth in the statute warrant such relief, we also reject BNY's claim that because the Bahamian liquidation has already been pending for three years, forcing it to turn over the MIBL Accounts to movants and to prosecute its claims in the Bahamas will not "best assure an economical

and expeditious administration" of MIBL's estate. The administration of MIBL's estate in a single forum subject to the supervision of a single court is clearly more economical and expeditious that piecemeal administration in several different forums. The fact that MIBL's liquidation has been pending for three years does not change this conclusion—if anything, it merely highlights the need to centralize proceedings in the proper forum.

BNY contends that we should, *sua sponte*, grant it summary judgement and dismiss MIBL's § 304 petition because MIBL has not and cannot satisfy §§ 304(c)(1), (2) or (4). We recognize that we can grant summary judgment to a non-moving party, *sua sponte*, where circumstances permit. *See Lowenschuss v. Kane*, 520 F.2d 255, 261 (2d Cir. 1975); *Wiradihardja v. Bermuda Star Line, Inc.*, 802 F.Supp. 989, 994 (S.D.N.Y.1992). However, we have reviewed the record and conclude that § 304(c) has been satisfied in its entirety and that we should grant comity to the Bahamian proceedings. Therefore BNY is not entitled to summary judgment in its favor.

### Conclusion

We grant the motion.

SETTLE JUDGMENT.